*In re* JEFFREY DEVINE *et al.*, Minors.—(THE DEPARTMENT OF CHILDREN AND FAMILY SERVICES, Petitioner-Appellee, *v.* CHARLES DEVINE *et al.*, Respondents-Appellants.)

Fifth District   No. 79-50

Opinion filed March 3, 1980.

John P. Coady, of Taylorville, for appellant Kathy Devine.

Barbara Adams, of Hillsboro, for appellant Charles Devine.

Rick Keller, State's Attorney, of Effingham (Raymond F. Buckley, Jr., and Stephen J. Maassen, both of State's Attorneys Appellate Service Commission, of counsel), for appellee.

Mr. PRESIDING JUSTICE JONES delivered the opinion of the court:

Charles and Kathleen Devine were found unfit and their parental rights were ordered terminated. Their two minor children, Jeffrey and Stephanie, were made wards of the court and adjudged dependent and

neglected. From that order the parents appeal contending: (1) because the parents were mentally retarded and therefore not responsible for their inability to learn, they cannot be found unfit where the grounds of unfitness "arise out of the mental retardation," and (2) because the newborn child, Stephanie, was never in the care of either parent and was therefore never actually neglected by either parent, parental rights as to that child were improperly terminated.

Jeffrey Devine was born April 16, 1975. On June 17, 1977, a petition for adjudication of wardship was filed by the Department of Children and Family Services of the State of Illinois (hereinafter Department) alleging that the child was "neglected or dependent." On June 22, 1977, Jeffrey was placed in the temporary custody of the Department. The next day a detention hearing was held and temporary custody of the Department was continued.

On July 30, 1977, Stephanie Devine was born. Three days later on August 2, 1977, a petition for adjudication of wardship was filed alleging that she too was "neglected or dependent." That same day a hearing was held and Stephanie was placed in the temporary custody of the Department. The baby was taken from the hospital by a Department representative and not by either of its parents.

The cases of both children were consolidated on August 12, 1977. On September 13, 1977, a supplemental petition was filed in which the minors were alleged to be dependent because they were without proper care as a result of the mental disability of their parents. In the supplemental petition their mother's IQ was alleged to be 55, with 90 to 100 specified as normal. On March 31, 1978, an amendment to the supplemental petition was filed in which the minors again were alleged to be dependent because of the mental disability of their parents. In the amendment their father's IQ was alleged to have been estimated to be below 60, and he was alleged to have been diagnosed as mentally retarded. On April 13, 1978, an adjudicatory hearing was held. The parents were represented by appointed counsel throughout the proceedings. At the adjudicatory hearing the following evidence was adduced.

A few days after the birth of Jeffrey in April 1975, a registered nurse from the county health department visited the Devines. The visit was part of a program whereby the homes of first-born children were observed to determine whether the parents were in need of guidance in the care of the baby. She found the Devines greatly in need of such assistance. They were having difficulty reading the numbers on the bottles and therefore found it difficult to prepare the formula. They did not know how to change the baby's diapers. The baby suffered from diaper rash. Despite the nurse's efforts during frequent regular visits over the next 14 months, the Devines failed to follow her instructions. At length the Devines

learned to make the baby's formula but after a few months they stopped making it and gave him soda pop and chocolate milk instead. Although the nurse showed them numerous times how to wash the baby's bottles they did not do so. Baby food in jars in the refrigerator was moldy. The home was extremely dirty. In June of 1976 she notified the Department, principally because the mother was not cooking and feeding the family. During the entire time the nurse worked with the Devines she observed no progress made by them.

The Department sent a homemaker to teach the mother the skills necessary for caring for the baby, herself and the home. The homemaker arrived to find the apartment filthy with "dirty diapers and dirty sanitary napkins all over." Dirty clothes were mixed with clean ones in piles scattered throughout the apartment. The dishes were dirty and the refrigerator was filled with spoiled food. There were roaches on the food. The baby was dirty and wearing diapers soiled with urine and feces. Because the apartment was a particularly shabby one, another apartment, clean and comfortable, was made available to them in February 1977 in Federal housing.

At that time the Devines were referred to the Huddleston program, an intensive eight-week family living demonstration program for teaching basic homemaking and childrearing skills. Both parents participated in the program with no success. During the first four weeks of the program the Huddleston homemaker transported the Devines to a training center three days a week. During the four-week follow-up period the Huddleston homemaker spent all day with the Devines three days a week and half the day with them two days a week. The homemaker found the mother unable to remember from one visit to the next how to add water to prepare food from a mix. The homemaker found food left out in the kitchen and rotten food, including meat, in the refrigerator. During this intensive effort to teach the Devines the homemaker found that they gave the baby cookies for breakfast. The floors were usually dirty. The baby licked them. The baby would put rocks, screws and rubber bands in his mouth. If the homemaker pointed out to the baby's mother that he had something dangerous in his mouth, his mother would remove it. She would not do so unless the danger were called to her attention by the homemaker. The playpen was so full of trash and dirty clothing that there was no room for the baby. The homemaker attempted to teach the Devines to bathe the baby but they were unable to remember what they had been taught at the time of the next visit. Although the mother sometimes deliberately refused to do certain tasks, such as washing dishes and cooking meals, in general the Devines were very cooperative but simply unable to remember what they were taught or unable to perform what they had been taught without supervision. During the time the

Huddleston homemaker worked with the Devines she noticed no improvement in the home. She testified that the mother "would have to have someone with her all the time to care for the children."

In April, at the end of the two-month Huddleston program, the homemaker who earlier had worked with the Devines returned to continue her work with them. She found that the new apartment looked the way the former one had. She returned to find roaches on the baby, on his clothing and on the food he ate. The roaches bit him during the night. This homemaker attempted to teach the Devines basic skills twice a week from June 1976 to June 1977 with no discernible success. The child remained dirty, his diapers soiled and his hair matted. There still were boxes of sour chocolate milk in the refrigerator. The Devines seemed to think that they had to spend their food stamps when they received them. Large amounts of food continued to spoil in the refrigerator and was regularly discarded by the homemaker. Dishes continued to be thick with grease after they had been washed by the mother. Once when the child was two years old he was found to have a one-inch burn which began on his forehead and nearly encircled his head. Neither parent knew how the boy had been burned. At the time it occurred the child was in the care of his father. His mother was out dancing.

A social worker visited the home from time to time. She found roaches and filth. She too found the playpen filled with trash and the baby in extremely soiled diapers. He picked up food from the floor as well as a baby bottle from which he tried to drink containing milk so clabbered it was almost solid.

With the passage of time the child was observed to be developmentally delayed in language. As a result he was referred to and attended the Nanon Wood Achievement School from March until August of 1977, when he was removed and apparently placed in foster care. The director of the program felt that a more stimulating environment than that provided at home would aid the child's development. At the hearing held on June 23, 1977, when the child was over two years old, the director testified that the boy still did not talk though he had improved while in the program. Of his physical appearance she said that initially he arrived at the school in a filthy condition with his diaper extremely soiled. She had noticed improvement since the returning Department homemaker had been in the home. The boy appears to have entered the school during the followup period of the Huddleston program.

On July 30, 1977, Kathleen Devine gave birth to Stephanie, whose father was not Charles Devine but a man who had had three children taken from him because of his abuse of them, according to the testimony of a Department representative at the hearing held on August 2, 1977. She had been seeing him regularly for some time and often spent the night at

his house. When she had become pregnant Charles Devine threatened to kill the child because it was not his. Charles Devine admitted to having extramarital affairs. Before the birth of Stephanie the Devines had been made aware that the children might be taken from them. The mother responded to the social worker, "He's better off dead than to go with you." The director of the school the child attended testified that the mother stated to her that "they are digging my grave if they take the child away from me. If they take him away, I'm digging his grave." There was concern that she might harm both herself and the child, Jeffrey. According to the social worker, the mother expressed the wish that she be allowed to keep Jeffrey until the birth of the other child. The mother wanted to be allowed to keep one of the children, though she did not care which one, to keep her company. Her husband indicated that they needed Jeffrey for financial purposes in order to receive aid.

After Stephanie was born the Devines visited the children in foster care three times during the 8 months before the adjudicatory hearing. The mother would not change Stephanie's soiled diapers. The first child had been toilet trained within 2 weeks of being placed in foster care, according to the testimony of a Department representative at the August 2, 1977, hearing. Once during a visit the parents placed the baby, Stephanie, in an infant seat upside down. The baby had to be righted by the social worker.

On the court's motion a psychiatrist had examined both parents. He testified that in an intelligence test in which a score of 90 to 100 indicates average intelligence, the mother had earned a full scale IQ of 55, which gave her a mental age of between 8 and 9. The father had earned an IQ of 63, which gave him a mental age of between 9 and 10. Both parents were diagnosed with mental retardation of mild severity. The psychiatrist indicated that, given the nature of mental retardation, the parents were likely to improve their skills only slightly at best. He said that persons in the IQ range of the Devines are sometimes able to perform simple manual tasks, such as cooking a meal, under close supervision. He expressed the opinion that the Devines could not do a good job of raising children, that they could not provide a child with the love, discipline, education and instruction afforded by normal parents. It was frequently stated by other witnesses that the mother displayed no affection toward Jeffrey although the father did so. The father was also said to try harder and to do more to care for the child and the home than did the mother.

The mother testified briefly. She knew the names of her children and the day and month both children were born but not the year of their births. She knew that Jeffrey was 3 years old but did not know Stephanie's age. She named Ronnie Smith as the father of Stephanie and said she still saw him once or twice a week. The psychiatrist reported in the evaluation

of the mother that she thought her mother was 33 years old but that since her own age was 22, that was hardly possible. The father also testified briefly. He knew the children's names but could not provide their birth dates. He said he claimed both children as his own. The psychiatrist reported in the evaluation of the father that he did not know how long he had been married.

On June 19, 1978, the parents were found unfit for failure to maintain a reasonable degree of interest, concern or responsibility as to the child's welfare, for open and notorious adultery or fornication and for substantial neglect of the child which is continuous or repeated. The court found:

> "Neither Charles Devine nor Kathleen Devine are able to mentally absorb past learning experiences to such an extent that they can make decisions based on these experiences; that teaching has been provided continuously in simple, repetitive terms; that Charles Devine and Kathleen Devine are unable to perform simple household tasks on a day by day basis."

The court found it in the best interests of both children that parental rights be terminated. The minor children were declared wards of the court and adjudged dependent and neglected. The guardianship administrator for the Department was appointed their guardian with the power to consent to their adoption. From this order the parents appeal.

Appellants contend that mentally retarded parents cannot be found unfit where the grounds of unfitness are themselves caused by the mental retardation of the parent. This position is advanced for the reason that the retarded parent is not responsible for his inability to care for his child and is therefore not at fault. Under appellants' view, no matter how appallingly uncared for a child may be and no matter how dim the prospect of good care by the parent in the future, parental rights cannot be terminated if the lack of care is the result of the parent's mental retardation. Under this view presumably a child may be removed from the custody of the retarded parent but can never be adopted into a wholesome loving home. Such a child's brightest prospect would be a childhood of foster care.

■■ Appellants err in concluding that only a parent who is at fault may be found unfit. We assume that by "at fault" appellants mean to imply the imposition of blame because the actor knew or should have known the consequences of his act or omission. In the grounds of unfitness set forth in subsection D of section 1 of the Adoption Act (Ill. Rev. Stat. 1977, ch. 40, par. 1501D) nowhere appear such words as "wilful," "intentional," "knowingly," "negligently" or any other word relating to the state of mind or will of the unfit person. One of the grounds on which the Devines were found unfit is "failure to maintain a reasonable degree of interest, concern or responsibility as to the child's welfare" (Ill. Rev. Stat. 1977, ch. 40,

par. 1501D(b)); the ground is simply "failure"—not "knowing failure," not "negligent failure." Similarly, it is "substantial neglect of the child if continuous or repeated" (Ill. Rev. Stat. 1977, ch. 40, par. 1501D(d)) which can lead to the loss of parental rights, as it did in the case of the Devines, not "wilful substantial neglect." Thus a parent can be unfit without fault. Such a conclusion is necessary if it is to accord with the legislative intent of an act manifestly concerned with the best interests of the child. Section 20a of the Adoption Act (Ill. Rev. Stat. 1977, ch. 40, par. 1525) expressly instructs that "the best interests and the welfare of the person to be adopted shall be of paramount consideration in the construction and interpretation of this Act." We abide by that instruction. A child is no less exposed to danger, no less dirty or hungry because his parent is unable rather than unwilling to give him care.

■■ Appellants claim also that though they failed, they tried and that effort rather than success should be used as the measure of unfitness. For that proposition appellants cite *In re Taylor* (1975), 30 Ill. App. 3d 906, 334 N.E.2d 194, where the efforts of the parent to visit children in custody were thwarted by representatives of the Department. The parent's failure to visit the children because the Department denied her the opportunity to do so could hardly indicate a lack of interest, concern or responsibility as to the child's welfare. In the case of *In re Tolbert* (1978), 62 Ill. App. 3d 927, 378 N.E.2d 565, we distinguished *Taylor* and found that a mother's failure to protect her children's health despite certain efforts by her warranted termination of parental rights for failure to maintain a reasonable degree of interest, concern or responsibility as to the children's welfare and substantial neglect. As we said in *Tolbert*, "In the area of health, however, results are paramount. Whatever the reason, upon review of the evidence, it cannot be denied that Marie Tolbert failed to protect her children's health." (62 Ill. App. 3d 927, 930-31, 378 N.E.2d 565, 568.) So too in the instant case, whatever the reason, the Devines substantially neglected the child continuously and repeatedly and failed to maintain a reasonable degree of interest, concern or responsibility as to Jeffrey's welfare.

■■ Appellants also contend that parental rights as to Stephanie were improperly terminated because she was never actually neglected by them. In their brief appellants state, "The inability of the Devines to care for a new born [*sic*] child because of their limited mental capacity was alleged, and substantially proven." Appellee points out that appellants concede that Stephanie was properly found dependent, that the remaining issue of parental unfitness was resolved by the presentation of clear and convincing evidence of unfitness and that the termination of parental rights as to that child was consequently proper. We agree.

The Juvenile Court Act (Ill. Rev. Stat. 1977, ch. 37, par. 701—1

*et seq.*) (hereinafter the Act) specifies in section 2—1 (Ill. Rev. Stat. 1977, ch. 37, par. 702—1) that proceedings may be instituted under the provisions of the Act concerning children who are dependent, as defined in section 2—5 (Ill. Rev. Stat. 1977, ch. 37, par. 702—5). Section 2—5 defines a dependent minor in pertinent part as follows:

"(1) Those who are dependent include any minor under 18 years of age * * *

(b) who is without proper care because of the * * * mental disability of his parent * * *."

Section 4—8 (Ill. Rev. Stat., 1978 Supp., ch. 37, par. 704—8) requires the court, if it finds that a minor is a dependent person and that it is in the best interests of both the minor and the public that he be made a ward of the court, to note in its findings whether the minor is dependent and adjudge him a ward of the court. That was done here.

Section 5—9(1) (Ill. Rev. Stat. 1977, ch. 37, par. 705—9(1)) provides that a ward of the court under the Act may be the subject of a petition for adoption. Section 5—9(2) (Ill. Rev. Stat. 1977, ch. 37, par. 705—9(2)) further provides that if the court finds it in the best interests of the minor, a guardian may be appointed and authorized to consent to the adoption of the minor, as occurred here. That section also provides that an order empowering the guardian to consent to adoption terminates parental rights. Section 5—9(3) (Ill. Rev. Stat. 1977, ch. 37, par. 705—9(3)) requires a finding of unfitness, in compliance with the Adoption Act (Ill. Rev. Stat. 1977, ch. 40, par. 1501 *et seq.*), of a parent who does not consent to the order authorizing the guardian's consent to adoption. The definition of "unfit person" within the Adoption Act provides the grounds for a finding of unfitness (Ill. Rev. Stat. 1977, ch. 40, par. 1501D):

" 'Unfit person' means any person whom the court shall find to be unfit to have a child sought to be adopted, the grounds of such unfitness being any one of the following:

* * *

(b) Failure to maintain a reasonable degree of interest, concern or responsibility as to the child's welfare;

* * *

(d) Substantial neglect of the child if continuous or repeated;

* * *

(j) Open and notorious adultery or fornication."

Appellants claim that an allegation and finding of dependency as to Stephanie cannot be a ground for or equivalent to unfitness. That, of course, is correct. However, dependency is not alleged as a ground for the unfitness of these parents. The grounds of their unfitness are the three set forth in the statute as stated above which were alleged and proved by clear and convincing evidence in the court below. Thus the finding of

dependency and subsequent finding of unfitness accorded with statutory requirements for the termination of parental rights. Since parental rights were properly terminated because of the findings of dependency and unfitness, it was not necessary that Stephanie be found a neglected minor pursuant to section 2—4 of the Act (Ill. Rev. Stat. 1977, ch. 37, par. 702—4) for parental rights to have been terminated. Therefore we need not reach the issue of whether parental rights could have been improperly terminated, because Stephanie was never actually neglected by her parents who had never had her in their care.

Affirmed.

KARNS and SPOMER, JJ., concur.