2023 IL App (1st) 220700
Opinion Filed January 26, 2023

Fourth Division

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

| | | |
|---|---|---|
| *In re* A.R., | ) | Appeal from the Circuit Court |
| | ) | of Cook County, Illinois |
| Minor -Appellee, | ) | Juvenile Justice and Child Protection |
| | ) | Department, Child Protection |
| (The People of the State of Illinois, | ) | Division |
| | ) | |
| Petitioner-Appellee, | ) | |
| | ) | No. 16 JA 468 |
| v. | ) | |
| | ) | |
| Isabel R., | ) | |
| | ) | Honorable Andrea Buford, |
| Respondent-Appellant.) | ) | Judge, Presiding. |

JUSTICE MARTIN delivered the judgment of the court, with opinion.
Presiding Justice Lampkin and Justice Hoffman concurred in the judgment and opinion.

**OPINION**

¶ 1    Respondent, Isabel R., appeals from trial court's orders terminating her parental rights and

granting the State the power to consent to the adoption of respondent's minor child, A.R.

Following prolonged adjudicatory and dispositional hearings, the trial court found Isabel unfit to

parent A.R. pursuant to two separate statutory grounds of the Adoption Act: (1) failure to make

reasonable efforts to correct the conditions that were the basis for the removal and/or failure to

make reasonable efforts toward reunification during certain specific nine-month periods; and

(2) inability to discharge parental responsibilities supported by competent evidence of mental impairment, mental illness, or an intellectual or developmental disability. 750 ILCS 50/1(D)(m), (p) (West 2020). The trial court terminated Isabel R.'s parental rights and placed A.R. in the guardianship of the Department of Children and Family Services (DCFS) with the right to consent to adoption.

¶ 2        Isabel argues that the court's determination as to each statutory ground was against the manifest weight of the evidence. She contends that the court erred when it found DCFS made reasonable efforts to effectuate the goals of its service plan, as the record demonstrates that the services provided to her were inadequate considering her language barriers, individual needs, and disability. Isabel alternatively asserts that there was insufficient evidence to find her unfit where she made meaningful progress in services despite DCFS's inadequate service offerings. She asks that we reverse the trial court's findings and order of termination. We affirm.[1]

¶ 3        Initially, we note that this appeal was accelerated pursuant to Illinois Supreme Court Rule 311(a) (eff. July 1, 2018). Pursuant to that rule, the appellate court must, except for good cause shown, issue its decision in an accelerated case within 150 days of the filing of the notice of appeal. Ill. S. Ct. R. 311(a)(5) (eff. July 1, 2018). Here, Isabel filed her notice of appeal on May 19, 2022. Thus, the record on appeal was due in this court on June 23, 2022, and our disposition was due on October 17, 2022. See Ill. S. Ct. R. 311(a)(4), (5) (eff. July 1, 2018). On July 18, 2022, Isabel's counsel filed a motion for extension of time to file the appellant brief. On August 16, 2022, appellees' counsel filed their first of two motions for extension of time to file the appellee brief. Thereafter, on October 7, 2022, Isabel's counsel filed a motion for extension of time to file her

---

[1]In adherence with the requirements of Illinois Supreme Court Rule 352(a) (eff. July 1, 2018), this appeal has been resolved without oral argument upon the entry of a separate written order.

reply brief. The case became ready on October 17, 2022. We find these reasons to constitute good cause for this decision to issue after the timeframe mandated in Rule 311(a).

¶ 4                                                  I. JURISDICTION

¶ 5        The circuit court ordered the termination of Isabel's parental rights on October 26, 2021. Isabel timely filed a motion for new trial, which the court denied on April 25, 2022. On May 19, 2022, Isabel filed a timely notice of appeal. Accordingly, this court has jurisdiction pursuant to article VI, section 6, of the Illinois Constitution (Ill. Const. 1970, art. VI, § 6) and Illinois Supreme Court Rule 301 (eff. Feb. 1, 1994) and Rule 303(a) (eff. July 1, 2017), governing appeals from a final judgment of a circuit court in a civil case.

¶ 6                                                  II. BACKGROUND

¶ 7        A.R. was born to then 17-year-old Isabel on April 1, 2016. Isabel, who was sexually abused by a man[2] nearly thrice her age, was unaware that she was pregnant until the day prior to A.R.'s birth. Based upon comments Isabel made while in labor and shortly after giving birth, hospital personnel questioned her ability to safely parent A.R.[3] Following her birth, A.R. was found to have abnormal findings on a standard newborn blood test and was thereafter diagnosed with enterococcus urinary tract infection, hypotonia, ornithine transcarbamylase deficiency, feeding intolerance, lens opacity, and small gestational age. Ultimately, A.R. was diagnosed with a rare mitochondrial disorder, Leigh's disease.[4] A.R. requires an extensive 24-hour specialized care plan,

---

[2]Court-ordered DNA testing subsequently confirmed that Cristobal G.-G. is A.R.'s father. On September 26, 2018, Cristobal filed a "Final and Irrevocable Consent to Adoption," consenting to A.R. being adopted by her foster parents, Ross and Sheila K. On October 5, 2018, the trial court found Cristobal unfit and concluded it was in A.R.'s best interests that his parental rights be terminated. He is not a party to this appeal.

[3]Nursing staff reported Isabel denied she was pregnant as she was pushing to deliver A.R. and later asked questions such as "When will my baby turn one?" and "Will I have to buy special food for my baby?"

[4]Leigh's disease "is a rare inherited neurometabolic disorder that affects the central nervous system." *Leigh's Disease*, Nat'l Inst. of Neurological Disorders & Stroke,

has a feeding tube, is on a daily medication regimen, and receives early intervention services including speech, developmental, and occupational therapies and hippotherapy.

¶ 8      On May 23, 2016, A.R. was taken into custody by DCFS. On May 25, 2016, the State filed a petition for adjudication of wardship and motion for temporary custody, alleging that A.R. was without proper care because of the physical or mental disability of her parent (705 ILCS 405/2-4(1)(b) (West 2016)). Specifically, the State noted that Isabel, who was unaware that she was pregnant until she gave birth, is cognitively delayed and has been diagnosed with a learning disability. It further noted that A.R. was born with special needs and is medically complex, requiring medical follow-up and a specific daily schedule to address her needs. The motion was supported by an affidavit from DCFS investigator Celmira Bolanos-Ayala, who averred that Isabel did not receive prenatal care during her pregnancy and showed no initial interest in parenting A.R. Bolanos-Ayala attested that school staff had informed her that Isabel functions at a second or third grade level. Further, A.R. has several medical conditions requiring appointments and specific measuring of her formula due to a genetic condition. Bolanos-Ayala further averred that Isabel's mother has special needs, is illiterate, works the third shift, and that Isabel was sexually abused on at least three occasions while in her care. Lastly, Bolanos-Ayala concluded that—due to Isabel's cognitive delays and A.R.'s complex medical issues—reasonable efforts could not prevent or eliminate the necessity of removing A.R. from Isabel's home. Based on the facts alleged in the petition, the circuit court issued an order granting temporary custody of A.R. to the DCFS guardianship administrator.

¶ 9      The State amended the petition on June 2, 2016, alleging that A.R. was abused and neglected pursuant to sections 2-3(1)(b) and 2-3(2)(ii) of the Juvenile Court Act of 1987 (Juvenile

---

https://www.ninds.nih.gov/health-information/disorders/leighs-disease (last visited Jan. 17, 2022) [https://perma.cc/JN4A-C2XS]. Leigh's disease is also referred to as Leigh syndrome.

Court Act) (*id.* § 2-3(1)(b), 2-3(2)(ii)). The following day, the court held a contested temporary custody hearing regarding A.R. At the conclusion of this hearing, the court again granted temporary custody of A.R. to DCFS. Isabel subsequently filed a motion to compel visitation. On June 27, 2016, the court ordered that a written visitation plan was to be tendered to all parties and that DCFS must immediately implement the visitation plan and refer Isabel for parent coaching. On October 3, 2016, the court amended the temporary custody order, *nunc pro tunc* to June 3, 2016.

¶ 10      In separate proceedings, the State also filed a petition for adjudication of wardship for Isabel alleging that, pursuant to the Juvenile Court Act, Isabel was abused or neglected. Following an adjudication hearing on October 7, 2016, the court found that Isabel was abused and neglected (lack of care and injurious environment) pursuant to sections 23(1)(a) and 23(1)(b) of the Juvenile Court Act (*id.* § 2-3(1)(a), (b)). She was subsequently placed with a foster family.

¶ 11                                     A. Adjudication Hearing

¶ 12      On October 5, 2017, the court held a hearing on the State's petition for adjudication of wardship. Isabel stipulated to the evidence provided at the hearing, including voluminous educational and medical records from Rolling Meadows High School, Carl Sandburg School, Lurie Children's Hospital, and Northwest Community Hospital. The parties stipulated to the testimony of Bolanos-Ayala, who would testify she was assigned to investigate allegation number 60 (substantial risk of physical injury/environment injurious to health and welfare by neglect) involving A.R. On April 2, 2016, Isabel told Bolanos-Ayala that (1) she had no idea she was pregnant and never felt the baby, (2) she lives with her mother in a two-bedroom apartment with four other adults (including three men), (3) she did not want to go home with A.R. and learn to care for her because she did not want to leave her mother's side, and (4) that A.R. could go live

with her attorney and she would visit. Bolanos-Ayala would additionally testify that Elvira S., Isabel's mother, stated she was unaware Isabel was pregnant, and that while she had noticed approximately two weeks prior that Isabel had not gotten her menstrual cycle, she did not take her to the doctor because her medical card was cancelled. Further, Elvira related that, in February 2016, she took Isabel to the pediatrician because she was vomiting. The pediatrician recommended a urine test, but Isabel was unable to give a sample. Elvira never brought Isabel back to the pediatrician.

¶ 13 The parties additionally stipulated to the testimony of DCFS child protection investigator Jessica Furio, who had a conversation with Isabel on April 5, 2016. Isabel told Furio that she (1) did not want to move out of her mother's home, (2) wanted parenting classes, (3) did not feel comfortable holding A.R., and (4) did not want to keep A.R. Lastly, the parties stipulated to the testimony of Rolling Meadows police detective Marcin Magnuszewski regarding his interviews with Cristobal G.-G. and Isabel. A psychological evaluation of Isabel, which was entered into evidence, revealed that Isabel's "intellectual functioning is extremely low" and she performed in the mildly intellectually disabled range.[5] Isabel's individualized assessment results demonstrated that Isabel's cognitive functioning level is within the very delayed range, and the percentile rank for her communication, daily living skills, and socialization were 1%. Following the hearing, the court found that the State had proven, by a preponderance of the evidence that A.R. was neglected (injurious environment) pursuant to section 2-3(1)(b) of the Juvenile Court Act (*id.* § 2-3(1)(b)). The circuit court entered a written adjudicatory order the same day and scheduled the matter for a dispositional hearing.

[5]The psychological evaluation noted that all interview details and assessment measures were administered in Spanish and that her extremely low intellectual performances are not due to a language barrier but are indicative of very limited intellectual functioning.

¶ 14                                  B. Dispositional Order

¶ 15          On February 7, 2018, the court entered a disposition order adjudicating A.R. a ward of the court. As A.R. was previously found to be neglected and dependent, the court determined that, despite reasonable efforts having been made to prevent or eliminate the need for A.R.'s removal, appropriate services aimed at family preservation and reunification had been unsuccessful. Accordingly, temporary custody was terminated and A.R. was placed in the custody/guardianship of DCFS guardianship administrator Janet Wukas Ahern. The court set a goal for A.R. to return home in 12 months' time.

¶ 16                                  C. Permanency Proceedings

¶ 17          On April 27, 2018, a permanency order was entered, which acknowledged that DCFS has made reasonable efforts in providing services to facilitate achievement of the permanency goal. A separate agreed order entered the same day indicated the parties agreed to the finding of reasonable efforts without prejudice until the completion of the next permanency hearing. Thereafter, on May 25, 2018, the State filed a permanency hearing report with the circuit court. The hearing report indicated that Isabel had made reasonable efforts[6] to reach the goal of return home; however, she had not made satisfactory progress toward that goal. Specifically, the report detailed that Isabel appears to continue to struggle with caring for her daughter and that, while at times Isabel demonstrates that she has retained some of her parenting knowledge, she often (1) forgets basic care techniques from one week to the next, (2) struggles to engage her daughter, (3) needs reminders of when to feed and change A.R., and (4) requires instruction to ensure A.R.'s safety. Further, the hearing report indicated that A.R. was doing well in her foster placement and had been able to make great strides in her development, despite her aggressive form of mitochondrial

_____

[6]These reasonable efforts included successfully completing a psychological evaluation, attending therapy regularly, and participating in regular visitation with her daughter.

disorder. A.R. regularly visits a neurologist, cardiologist, ophthalmologist, nephrologist, and genetic specialist. Additionally, A.R. attends various therapies weekly to help keep her on track developmentally. Lastly, the report indicated that A.R. had regular visitation with Isabel and it was evident from the affection A.R. shows Isabel during her visits that she is fond of Isabel. Ultimately, the State continued to recommend a permanency goal of return home within 12 months.

¶ 18        On August 22, 2018, a permanency order was entered, *nunc pro tunc* to May 25, 2018. This order changed the permanency goal for A.R. from return home to substitute care pending court determination of parental rights. The reason for this change was because of "evidence presented to court at permanency hearing of 5/25/18."

¶ 19                    D. Termination of Parental Rights and Best Interests Hearings

¶ 20        On October 10, 2018, the State filed a motion to permanently terminate Isabel's parental rights and to appoint a guardian with the right to consent to adoption. The petition alleged that Isabel failed to make reasonable efforts to correct the conditions which were the basis for the removal of A.R. pursuant to section 1(D)(m) of the Adoption Act and that she was unable to discharge parental responsibilities due to an impairment, in violation of section 1(D)(p) of the Adoption Act. 750 ILCS 50/1(D)(m), (p) (West 2018). The petition further alleged that it was in A.R.'s best interests that a guardian be appointed with the right to consent to adopt. On April 26, 2019, the State filed a pleading specifying the nine-month time period they were relying on (October 5, 2017, through July 5, 2018), pursuant to the Adoption Act. See *id.* § 1(D)(m).

¶ 21        On October 30, 2019, the trial court conducted a termination hearing. The State presented the testimony of Jennifer Ferber, licensed clinical social worker and clinical lead supervisor with the La Rabida Children's Hospital's integrated assessment program. Ferber was qualified as an expert in the field of clinical social work. She testified that, in 2016, she performed an integrated

assessment for A.R. and Isabel (as the respondent parent). This assessment consisted of a developmental screening of A.R. and two interviews—one with Isabel and one with A.R.'s foster parents. Isabel's caseworker was present for the interview, which began in Spanish. However, Isabel soon after requested that the interview be conducted in English, and Ferber complied. Ferber explained that she honors any client's request for their preferred language. Following her assessment, Ferber documented her findings in a July 2016 integrated assessment report (IAR), which was entered into evidence. In the IAR, Ferber noted that Isabel would benefit from culturally sensitive treatment providers and indicated that, although Isabel is bilingual, she stated she would be comfortable working with service providers in Spanish. Ferber listed several recommended services for Isabel in the IAR—consultation with DCFS consulting psychologists, parent capacity assessment, individual trauma-based therapy, a parenting support group in conjunction with Teen Parenting Support Network (TPSN), a parenting coach that can meet specific developmental needs, and participation in the Nurturing Parenting program.

¶ 22 Ferber testified that she performed a second integrated assessment with Isabel a couple of weeks later, regarding the DCFS investigation into Isabel as an abused and neglected minor. In that IAR, Ferber again listed several recommended services for Isabel, including (1) referral to the developmental disabilities administrator, (2) referral for a mentor, (3) referral for a parenting group with TPSN, and (4) parenting education with TPSN. These services were recommended based on Isabel's self-reporting as well as Ferber's knowledge of her cognitive issues. Ferber explained that the services recommended in the two IARs differed because generally different recommendations are provided based on whether the individual is a child or a parent in a DCFS case.

¶ 23 Next, DCFS investigator Melissa Vance testified. Prior to her employment with DCFS, she was employed by Uhlich Children's Advantage Network (UCAN) as a foster care case manager.

In her capacity, Vance worked with families to facilitate return home, visited with children in their foster homes, and supervised visits between parents and children. Vance was the family worker for Isabel and A.R.'s case from approximately September 2016 to August 2018. In her capacity, Vance prepared four service plans (November 4, 2016, April 26, 2017, October 23, 2017, and April 9, 2018) after reviewing the relevant IARs. During this time, Vance was in frequent communication with Isabel and saw her roughly once a week. Vance and Isabel spoke in English, the language Isabel communicated she preferred. Vance had monthly meetings with her supervisors to discuss Isabel's progress towards reunification with A.R. As of May 2018, neither Vance nor her supervisor recommended that Isabel have unsupervised contact with A.R. due to safety concerns during previous visits.[7] Some of Vance's personal concerns regarding interactions she observed between Isabel and A.R. included Isabel needing consistent reminders for the regular, basic care of A.R.—specifically when to feed and change A.R.

¶ 24        When Vance had concerns stemming from the visitations, she would discuss them with Bonnie Collins, Isabel's parenting coach, so that Collins could work more in depth with Isabel. She also discussed her concerns and Isabel's needs with Leticia Cruz, Isabel's case manager. To ensure she understood A.R.'s special needs, Vance had in-depth conversations with A.R.'s specialist in Texas, A.R.'s foster parent, and other doctors. Vance testified that Isabel made satisfactory progress in completing her psychological evaluation, attending visits with A.R., and attending counseling and therapeutic services. Isabel was also compliant in signing consents when necessary. However, Vance rated Isabel unsatisfactory in basic understanding and comprehension gained from the parent coaching.

---

[7]Vance recalled two specific incidents—one in October 2017 and one in November 2017—when Isabel failed to correct A.R. crawling towards safety hazards. After intervening to prevent harm to A.R., Vance spoke to Isabel about how dangerous the situations were.

¶ 25        Ultimately, Vance recommended changing A.R.'s permanency goal from reunification to substitute care pending termination, due to Isabel's limited progress in both understanding and being able to perform the necessary care tasks for A.R. and A.R.'s additional medical needs. On cross-examination, Vance testified that A.R.'s foster mother is a pediatric nurse and consideration was given both to this fact and A.R.'s extensive medical needs when determining the appropriateness of the foster home. She reiterated that UCAN took steps to educate Isabel about A.R.'s needs, including inviting Isabel to doctor appointments, connecting Isabel to A.R.'s specialist in Texas, and occasionally incorporating Isabel into A.R.'s many therapy appointments. Vance additionally explained that due to A.R.'s diagnosis and condition, there was a much higher risk associated with fever and illness. Therefore, the ongoing issue regarding Isabel's hygiene after diaper changes and during visits with A.R. was of particularly high concern and was consistently communicated to Isabel. Vance conceded that, despite a June 2016 court order allowing Isabel two visits a week with A.R., that the visits did not occur during Vance's duration on the case.[8] Vance agreed she had a different view of Isabel's visits with A.R. than the initial worker who supervised the visits—while that worker thought Isabel was consistent in providing necessary care to A.R., Vance believed Isabel was inconsistent.

¶ 26        Vance testified that, when she first received the case, it was marked as a Burgos case;[9] however, she is not bilingual and does not speak Spanish. Though a "Language Determination

_____

[8]On redirect examination, Vance explained that this was due to A.R.'s medical needs and her low energy.

[9]The Burgos consent decree of 1977 is a federal mandate, requiring that DCFS provide Spanish services to Spanish speakers. Julia Monzón, *Celebrating 40 Years of Burgos*, Noticias: A Publication of the DCFS Latino Advisory Council (Oct. 2017), https://www2.illinois.gov/dcfs/aboutus/policy/Documents/LAC/Noticias_1017.pdf#search=burgos [https://perma.cc/Q3TE-N4TF]. The decree requires, *inter alia*, "that Spanish Speaking children be placed in Spanish Speaking homes, that a Spanish Speaking worker is assigned to the case as the primary worker, that all communication and written documents are in Spanish, and that an interpreter is provided free of charge." *Id.*

Form" is required in Burgos cases, Vance was unaware if this form was given to Isabel. She was similarly unaware if a form was completed due to A.R. being placed in a non-Spanish speaking living arrangement and did not know that the Mexican Consulate ought to have been notified because Isabel is a Mexican national. Nevertheless, Vance was shown a service plan for Isabel that was entered before she was assigned the case and Vance conceded the form had been completed and the determination was that Spanish was the primary language.

¶ 27    Mary Lenling, who was qualified as an expert in occupational therapy in the early intervention setting, next testified. Lenling began working with A.R. in December 2015, when A.R. was eight months old. Lenling evaluated A.R.'s fine motor skills, using a standardized tool called the Peabody Developmental Motor Scales. A.R. and her foster family worked with Lenling to progress A.R.'s fine motor development. From December 2016 through June 2018, Lenling saw some improvement in A.R.'s development, but she did not reach her age level.

¶ 28    Collins, Omni Youth Services family support specialist for Isabel and UCAN caseworker, was qualified as an expert family support specialist. Collins testified that she does home visitations with her clients and teaches them about children's development. She began working with Isabel in December 2016, initially seeing her three times a month, when she would supervise visitation with A.R. Colins performed a family support specialist evaluation with Isabel, which indicated to her that Isabel needed help (1) developing an attachment, (2) engaging A.R. in activities that would promote A.R.'s development, and (3) learning how to communicate with A.R.'s foster mother about transition of care. After the permanency goal was changed, Collins worked with A.R. twice a month. Occasionally, Collins would make an extra visit to Isabel's home to address issues or prepare Isabel for a parenting capacity assessment.

¶ 29    Collins testified that, from approximately April to May 2018, Isabel made progress with her. While Isabel did not initially know how to interact with A.R., by this time she had begun singing nursery rhymes to and interacting with A.R. However, Collins conceded that Isabel still needed to make progress in identifying dangerous situations and keeping A.R. safe.[10] In the several months prior to this time, Collins had consistently redirected Isabel and encouraged her to act appropriately from a safety perspective. When Collins spoke to Isabel, she spoke to her in English, because Isabel preferred English, requested to have her services in English, and wanted to improve her English. While Collins initially had doubts regarding Isabel's proficiency in English (as she stammered when speaking and Spanish was her first language), Collins spoke to other workers who assured her that Isabel understood English as well as Spanish and informed her that Isabel stammered in Spanish as well.

¶ 30    On cross-examination, Collins noted that Isabel made all visits with A.R. (excepting illness) and that Isabel was a devoted mother who looks forward to time with her daughter. Collins additionally testified that Isabel was always affectionate with A.R., handled her gently, delighted in A.R.'s progress, and purchased clothing for A.R. Further, Collins explained she gave Isabel an Adult and Adolescent Parenting Inventory (AAPI), which measures five different areas of parenting: (1) awareness of developmental milestones, (2) empathy, (3) punishment and discipline, (4) family roles, and (5) age-appropriate power and independence. According to Collins, this test indicated that Isabel demonstrated some great parenting attitudes.

¶ 31    Neurologist Mary Koenig was next qualified as an expert in pediatric neurology. Koenig testified that she had seen A.R. four times for her mitochondrial disorder and had diagnosed A.R.

---

[10]Specifically, Collins mentioned an incident where A.R. crawled to a server room, full of heavy computers and cables, and two other instances where A.R.'s orthotics became wedged under her legs during a diaper change, causing A.R. pain, but Isabel failed to understand what was happening.

with Leigh syndrome. She explained that Leigh syndrome is a genetically inherited disorder that causes episodic regressions and that a patient "can go from walking around being totally fine to literally dead within a matter of 24 hours or less." Since Koenig began seeing her, A.R. has shown some neurodevelopmental delays and experienced at least one episode of neurologic regression.[11] A.R. was prescribed coenzyme Q10, ethylcodactin, creatine, and paradoxine, and Koenig recommended A.R. be hospitalized for any metabolic stressors (such as febrile illness). Koenig clarified that any time A.R. has an episode, she is at risk of dying.

¶ 32        On cross-examination, Koenig further explained that, as A.R. had her initial regressive episode as an infant, she has a worse prognosis and a shorter life expectancy.[12] Koenig detailed the type of care A.R. needs: (1) someone to maintain appropriate care of her fragile feeding tube, (2) routine physical and speech therapy for her muscle weakness and developmental delay, (3) someone who is able to see and recognize changes in A.R.'s day-to-day functioning, and (4) someone who can take care to ensure A.R. does not overexert herself. In response to the court's questioning, Koenig testified that a lay person of average intelligence could be trained to take care of A.R. On further cross-examination, Koenig discussed the potential impact of changing A.R.'s primary caregiver and the importance of the caregiver's historical knowledge of A.R.'s developmental growth and progress.

¶ 33        Phyllis Lofton, UCAN case manager for A.R., testified that she first received A.R.'s case in August 2018. Lofton created a service plan for the family and testified that she did not recommend any community-based services for Isabel, as Isabel was (1) still a ward of the court; (2) engaged in life skills services; (3) employed; (4) regularly participating in supervised visitation

---

[11]This resulted in some loss of speech capability and motor skills.

[12]Historically, A.R. would have had a life expectancy of two years. However, with modern medical care and aggressive management, it is unclear what A.R.'s life expectancy could be.

with A.R.; and (5) receiving parenting education, coaching, and therapy. Instead, Lofton recommended Isabel continue to engage in her services. When Lofton first met Isabel, she asked Isabel what language she would prefer to be spoken to and receive services in. Isabel very clearly indicated she wanted English. Lofton explained that A.R.'s permanency goal of substitute care pending termination of parental rights was recommended because A.R. "has a lot of very serious medical conditions that require a great deal of supervision." Additionally, Lofton stated that A.R. was in a loving, supportive, nurturing foster home, where her medical needs are being met. While the situation was very complicated, Lofton explained that they looked at the goal in terms of A.R.'s best interest and maintaining her health over time. On cross-examination, Lofton admitted she does not speak Spanish, she never had Isabel fill out a language determination form, and never referred Isabel to any services.

¶ 34        Finally, Cruz, UCAN case manager for Isabel, testified that she first received Isabel's case in November 2016. Cruz created several service plans in relation to Isabel as a ward of the court. She testified that she is bilingual—fluent in both English and Spanish—and that when she first received Isabel's case from DCFS, she spoke to Isabel in both languages, due to the Burgos designation on the case file. However, during their initial meeting, Isabel told Cruz she would like her services in English because she preferred to keep practicing her English. Since that time, Cruz primarily spoke to Isabel in English. When Isabel's foster mother was present at meetings, there would be a Spanish interpreter available for the foster mother (who did not speak English). Cruz provided several services for Isabel—parenting, therapy, life skills, and a psychological evaluation. As of April and May 2018, Isabel had made significant progress in her wardship services, in that she engaged in all recommended services and made every visit with A.R. Cruz did not and would not make any recommendation as to whether Isabel should have unsupervised

contact with A.R. since she did not personally observe visits between them. On cross-examination, Cruz clarified that she only referred Isabel to services as a ward and did not refer her for parenting programs or a parenting capacity assessment. Cruz stated she feels it is unfair to rate Isabel unsatisfactory for services she was not referred to.

¶ 35        On November 14, 2019, the termination hearing continued. Doctor Gladys Lillian Croom was qualified as an expert in clinical psychology. In 2018, Croom reviewed Isabel's records and spoke with Cruz, as Croom had concerns regarding Isabel's English literacy. Croom then gave Isabel an assessment, which lasted approximately four hours and was conducted in English. While Isabel had no difficulty during the interview portion of the assessment, Croom had some mild concerns about administering the objective measures (the Wechsler Adult Intelligence Scale and Wide Range Achievement Test) in English. Isabel complied satisfactorily with Croom's requests for the tests. Croom completed her psychological evaluation of Isabel on June 29, 2018, and recommended additional testing by a neuropsychologist. Croom diagnosed Isabel as presenting with a mild intellectual disability (as she scored below the threshold for borderline intellectual functioning, displayed evidence of an adaptive functioning deficit, and demonstrated maladaptive behaviors) and other specified trauma. Based on the reports Croom had received, and her assessment of Isabel (memory, recall, retrieval, and tracking difficulties Isabel displayed, "left neglect,"[13] and her social isolation), Croom did not recommend unsupervised contact between Isabel and A.R. Ultimately, Croom recommended Isabel may require supervision due to her memory and cognition issues.

---

[13]Croom explained that she observed Isabel demonstrated signs of left neglect, or frozen arm, in that she was not able to freely move that arm and her hand at the time she assessed her.

¶ 36        On cross-examination, Croom specified that Isabel's Vineland-3[14] scores were lowest on daily living skills and socialization and were higher on communication. Croom admitted that Isabel had scored slightly higher on an earlier IQ test that was administered in Spanish but stated that it was not statistically significant from her perspective as a clinical psychologist.

¶ 37        At the close of Croom's testimony, the State rested on its proofs for unfitness. Thereafter, the hearing shifted from Isabel's unfitness toward A.R.'s permanency goal.[15] A.R.'s guardian *ad litem* (GAL) then called Sheila K., A.R.'s foster mother, to testify. Sheila testified she and her husband have been foster parents for 17 years, generally focusing on children who need extra medical care. She is a registered nurse who has practiced in intensive care, cardiac care, labor and delivery, and high-risk nursery. A.R. first came to live with Sheila when she was 3½ weeks old. When A.R. was six months old, she was diagnosed with Leigh syndrome. Sheila testified regarding A.R.'s wide array of medical, developmental, and therapeutic services. She also explained the limitations A.R. faces at school and on a daily basis. Sheila stated that she and her husband have a marked preference to adopt A.R., rather than be appointed her guardians, so they can (1) have medical and end-of-life decision making that will not have to be submitted to a hospital's legal department, (2) ensure A.R. has access to their social security benefits, and (3) establish a special needs trust. Describing her relationship with Isabel, Sheila explained that Isabel has had weekly visits with A.R., that they speak at every visit, they have spent birthday parties together, and have celebrated Christmas. Sheila stated she feels like they have a "really good relationship," and she cares about Isabel. A.R. looks forward to seeing Isabel, and Sheila would like to continue the relationship with Isabel.

---

[14]Vineland-3 is intended to evaluate adaptive behavior.
[15]The termination portion of the hearing remained open with respect to the Office of the Public Guardian and Isabel.

¶ 38    On cross-examination, Sheila explained how she would help A.R. develop her own identity and learn about her cultural, family, and religious background. She additionally detailed why she thought adoption would afford A.R. more permanency and protect her from further stress. Sheila testified that, if A.R.'s permanency goal was changed to guardianship, she and her husband would decline to continue to care for A.R.

¶ 39    Lofton was next recalled to testify. She testified A.R.'s foster home is a safe and appropriate setting, and there have been no signs of abuse, neglect, or corporal punishment at any time. Lofton attested that UCAN's recommendation for A.R. was adoption pending termination of Isabel's parental rights. Lofton stated that adoption is in A.R.'s best interest because (1) the foster home is the only home A.R. has ever lived in, (2) her foster parents are very dedicated and have been strong advocates for her, (3) they ensure A.R. receives all the services and medical care she requires, and (4) it offers long-term stability. She described Isabel as very loving, affectionate, and patient towards A.R. On cross-examination, Lofton testified regarding an e-mail she received from Collins documenting Collins's concerns that A.R.'s foster parents did not want Isabel visiting in their home.

¶ 40    Following closing arguments, the court determined that—at that point in time— guardianship was in the best interest of A.R. Lastly, the court held that DCFS made reasonable efforts in providing services to facilitate achievement of the permanency goal.

¶ 41    On November 18, 2019, the court entered a permanency order indicating the goal for A.R. had changed from substitute care pending court determination of parental rights to private guardianship. On January 7, 2021, the court heard brief testimony from Lofton regarding A.R.'s status and UCAN's recommendation of adoption and substitute care pending court determination on parental rights. The court again entered a permanency order with a goal of private guardianship

for A.R. However, on that same date, the court also ordered DCFS to complete a permanency assessment within 90 days to weigh the impact/best interests of both adoption and guardianship on A.R.'s behalf. The permanency assessment was finished in late June 2021.

¶ 42       On October 26, 2021, the termination hearing resumed, and Isabel's counsel made an oral motion to dismiss the State's petition for termination of parental rights. Neither the GAL nor Isabel thereafter called any witnesses in their case-in-chief. Following closing arguments, the trial court found, by clear and convincing evidence, that Isabel—despite her reasonable efforts—failed to correct the conditions that brought A.R. into DCFS care. The court further held that Isabel is unable to discharge her parental responsibilities and that this inability will persist beyond a reasonable time, due to (1) A.R.'s medical complexity and (2) Isabel's cognitive delays and significant trauma. Lastly, the court denied Isabel's oral motion to dismiss the State's petition.

¶ 43       The hearing then proceeded to A.R.'s best interests. The State called Lofton to testify regarding A.R.'s relationship with her foster family; she testified consistently with her October 30, 2019, and November 14, 2019, testimonies. Additionally, Lofton testified to the strong bond she has witnessed between Isabel and A.R.'s foster family and stated she has seen no hesitancy regarding maintaining that relationship.

¶ 44       The State next called Sheila K., who also testified consistently with her November 14, 2019, testimony. Sheila explained in great detail what a typical day looks like for A.R., all the adaptive equipment A.R. uses, and the reasons she wants to adopt A.R. Finally, Sheila restated how committed she is to keeping Isabel and A.R.'s relationship ongoing and building A.R.'s connection to her heritage and identity. Lastly, the State called Ross K., A.R.'s foster father. Ross iterated his wish to adopt A.R. and explained his reasonings: (1) she is a wonderful child, (2) he is in love with her, (3) she needs them, (4) they need her, and (5) she is part of the family and is

connected to everyone. Ross testified they would be assertive in maintaining A.R.'s connection with Isabel. He also stated that he and his wife are learning Spanish. On cross-examination, Ross described in depth the reason he did not want to be A.R.'s guardian and instead wanted to adopt her. The court-ordered permanency evaluation, completed by Dalla Costa, was made part of the record. In the evaluation, Costa stated it is essential to A.R.'s current and long-term well-being that she remain in the care of her foster family.

¶ 45    Following closing arguments, the trial court determined that A.R. is a very medically complex child who is strongly bonded to both her foster family and mother and that it is not in A.R.'s best interest to move her from her current home. Ultimately, the court ruled that while "[its] heart really goes out to the mother in this case," the court has "to do what is in the best interest of A.R." On the same date, the court filed a written termination order finding that Isabel is unfit pursuant to sections 1(D)(m) and 1(D)(p) of the Adoption Act (750 ILCS 50/1(D)(m), (p) (West 2020)), and it was in the best interests of A.R. to terminate Isabel's parental rights. The court also entered a new permanency order with a goal of adoption.

¶ 46    Isabel filed a motion for new trial that, after brief arguments, was denied by the court on April 25, 2022. On the same date, the court entered a permanency order substantially similar to the order issued on October 26, 2021. Subsequently, Isabel filed a timely notice of appeal.

¶ 47                                    III. ANALYSIS

¶ 48    Isabel argues on appeal that (1) the juvenile court's findings and orders terminating her parental rights are void and are barred by (a) the doctrine of the law of the case, (b) *res judicata*, and/or (c) collateral estoppel; (2) reasonable efforts were not made by DCFS to effectuate the goals of the service plan; and (3) the court's findings were against the manifest weight of the evidence and the preponderance of the evidence where (a) there was insufficient evidence that she was unfit,

and (b) the best interest factors favor guardianship and reversal of the termination order. The State and Office of the Public Guardian counters that the court's determinations regarding Isabel's parental rights and A.R.'s permanency goal were supported by the manifest weight of the evidence. Further, they contend that the permanency planning goal of guardianship was not a final order and, therefore, *res judicata*, collateral estoppel, and the law of the case do not apply. Moreover, they argue that whether DCFS made reasonable efforts to facilitate the achievement of the permanency goal is not reviewable, where this court lacks jurisdiction.

¶ 49                    A. Trial Court's Findings Were Not Barred

¶ 50        Isabel first argues that the doctrines of (a) law of the case, (b) *res judicata*, and (c) collateral estoppel require that the termination of her parental rights be reversed. According to Isabel, when the juvenile court changed A.R.'s permanency goal to private guardianship in November 2019, it was thereafter precluded from terminating her parental rights and changing A.R.'s permanency goal again.

¶ 51                         1. Law of the Case Doctrine

¶ 52        The doctrine of law of the case "precludes relitigation of a previously decided issue in the same case." *In re Marriage of Wendy S.*, 2020 IL App (1st) 191661, ¶ 10 n. 4. " 'The doctrine applies to questions of law and fact and encompasses a court's explicit decisions, as well as those decisions made by necessary implication.' " *Lurie v. Wolin*, 2017 IL App (1st) 161571, ¶ 26 (quoting *American Service Insurance Co. v. China Ocean Shipping Co. (Americas), Inc.*, 2014 IL App (1st) 121895, ¶ 17). "However, the law-of-the-case doctrine is not binding on the trial court in a subsequent stage of the litigation when (1) there are different issues involved, (2) there are different parties involved, or (3) the underlying facts change." *Preferred Personnel Services, Inc. v. Meltzer, Purtill & Stelle, LLC*, 387 Ill. App. 3d 933, 947 (2009).

¶ 53      Here, the doctrine of law of the case is inapplicable. Isabel argues that when the trial court ordered guardianship in 2019, following the commencement of the proceedings on a petition for termination of parental rights, it was then prohibited from later ordering that Isabel's parental rights should be terminated and A.R.'s permanency goal should be changed to adoption. However, the record clearly indicates that the juvenile court made no determination on the petition during its 2019 proceedings. Rather, the hearing on the petition to terminate parental rights was commenced and continued before the juvenile court changed A.R.'s permanency goal to private guardianship. The hearing on the petition for termination later resumed on October 26, 2021. It was only then, after full arguments, that the court issued its ruling regarding Isabel's parental rights. Accordingly, law of the case does not apply.

¶ 54                                  2. Collateral Estoppel

¶ 55      Next, Isabel argues that enforcement of the termination orders should be barred as collateral estoppel applies. Collateral estoppel, also known as issue preclusion, was created to prevent relitigation of previously adjudicated claims. *Allianz Insurance Co. v. Guidant Corp.*, 387 Ill. App. 3d 1008, 1020 (2008).

¶ 56      A "party asserting collateral estoppel must establish, at a bare minimum, that '(1) the issue decided in the prior adjudication is identical with the one presented in the suit in question, (2) there was a final judgment on the merits in the prior adjudication, and (3) the party against whom estoppel is asserted was a party or in privity with a party to the prior adjudication.' " (Emphasis and internal quotation marks omitted.) *Davis v. Pace Suburban Bus Division of the Regional Transportation Authority*, 2021 IL App (1st) 200519, ¶ 85 (quoting *Abramson v. Marderosian*, 2018 IL App (1st) 180081, ¶ 44). Moreover, " '[f]or purposes of applying the doctrine of collateral estoppel, finality requires that the potential for appellate review must have been exhausted.' " *In re*

*A.W.*, 231 Ill. 2d 92, 100 (2008) (quoting *Ballweg v. City of Springfield*, 114 Ill. 2d 107, 113 (1986)).

¶ 57    In the present case, collateral estoppel is inapplicable, as there was no final judgment on the merits. At the time the court changed A.R.'s goal to guardianship, there was no final adjudication on the merits of the petition to terminate parental rights. The permanency order of November 18, 2019 was interlocutory and nonfinal. See *In re Joseph J.*, 2020 IL App (1st) 190305, ¶ 24 (explaining that a permanency order is nonfinal because, by statute, it "must be reviewed and reevaluated at least every six months until the permanency goal is attained"). A petition must be filed within 14 days of the entry of a permanency order to obtain review. *Id.*; Ill. S. Ct. R. 306(a)(5), (b)(1) (eff. Nov. 1, 2017). No such petition was filed in this case.

¶ 58    As aforementioned, the hearing on the petition to terminate parental rights was continued until October 26, 2021, when a final decision on the merits was made. Although this case involved numerous hearings over several stages, it clearly does not meet the requirement for the doctrine of collateral estoppel to apply. See *In re D.F.*, 201 Ill. 2d 476, 504 (2002) (holding the case at bar did not meet the requirement for collateral estoppel where the doctrine requires " 'two separate and consecutive cases arising on different causes of action' " (quoting *Nowak v. St. Rita High School*, 197 Ill. 2d 381, 389 (2001))).

¶ 59                                    3. *Res Judicata*

¶ 60    Isabel next argues that *res judicata* applies where the guardianship order was a final judgment on the merits and an appealable order. The equitable doctrine of *res judicata* provides that "a final judgment on the merits rendered by a court of competent jurisdiction bars any subsequent actions between the same parties or their privies." *In re B.G.*, 407 Ill. App. 3d 682, 686 (2011). *Res judicata* not only bars what was actually decided, but also whatever could have been

decided. *In re J.D.*, 2018 IL App (1st) 180580, ¶ 29 (citing *Hudson v. City of Chicago*, 228 Ill. 2d 462, 467 (2008)). For *res judicata* to apply, the following three requirements must be satisfied: (1) there was a final judgment on the merits that has been rendered by a court of competent jurisdiction, (2) an identity of cause of action, and (3) the parties or their privies are identical in both actions. *Id.*

¶ 61    It is well settled that, in custody matters, *res judicata* should not be strictly applied, as the most important consideration is the child's welfare. *In re J'America B.*, 346 Ill. App. 3d 1034, 1042 (2004). Additionally, trial court jurisdiction is continuing in child protection and custody matters, and adjudicated matters are not *res judicata* to future matters that demonstrate a change in conditions or circumstances. *In re K.B.*, 314 Ill. App. 3d 739, 755 (2000); see also *In re Finch*, 40 Ill. App. 2d 18 (1963) (table) (unpublished order under Illinois Supreme Court Rule 23) (an adjudication of dependency is subject to modification prior to such time that the child either reaches majority or has been legally adopted).

¶ 62    *Res judicata* is inapplicable in the present case. As aforementioned, the November 18, 2019, permanency order was not a final, appealable order. Rather than a conclusive order as to the rights of the parties, the order was reviewable. See *In re Joseph J.*, 2020 IL App (1st) 190305, ¶ 24. As our supreme court has held, " '[t]he selection of a permanency goal is not a final determination on the merits with regard to termination of parental rights but, rather, an intermediate procedural step taken for the protection of and best interests of the child.' " *In re D.S.*, 198 Ill. 2d 309, 329 (2001) (quoting *In re K.H.*, 313 Ill. App. 3d 675, 682 (2000)). Therefore, Isabel is unable to meet the necessary requirements to establish that *res judicata* applies.

¶ 63                    B. Termination of Parental Rights

¶ 64　　　　The Juvenile Court Act (705 ILCS 405/1-1 *et seq.* (West 2020)) and the Adoption Act (750 ILCS 50/0.01 *et seq.* (West 2020)) govern the proceedings for termination of parental rights. *In re D.F.*, 201 Ill. 2d at 494. "Illinois policy 'favors parents' superior right to the custody of their own children.' " *In re M.I.*, 2016 IL 120232, ¶ 19 (quoting *In re E.B.*, 231 Ill. 2d 459, 464 (2008)). This is because our courts recognize that parental rights and responsibilities are of deep import and should not be terminated lightly. *In re C.P.*, 191 Ill. App. 3d 237, 244 (1989). The involuntary termination of parental rights is a two-step process. 705 ILCS 405/2-29(2) (West 2020); *In re M.I.*, 2016 IL 120232, ¶ 20. First, the trial court must determine whether a parent is unfit, and second, the court must determine whether termination of parental rights is in the child's best interests. *In re Julian K.*, 2012 IL App (1st) 112841, ¶ 63.

¶ 65　　　　　　　　　　　　1. Unfitness Findings

¶ 66　　　　The State must first establish, by clear and convincing evidence, parental unfitness as delineated in section 1(D) of the Adoption Act. 750 ILCS 50/1(D) (West 2020). Only one listed ground of unfitness need be proven to support a finding that a parent is unfit. *In re Keyon R.*, 2017 IL App (2d) 160657, ¶ 16. When a respondent parent challenges the sufficiency of the evidence, we review the trial court's dispositional decision under a manifest weight of the evidence standard. *Id.* A finding is against the manifest weight of the evidence only if the opposite conclusion is clearly evident or if the finding itself is unreasonable, arbitrary, or not based on the evidence presented. *People v. Sanchez*, 2021 IL App (3d) 170410, ¶ 25 (citing *People v. Deleon*, 227 Ill. 2d 322, 332 (2008)); *In re Marriage of Yabush*, 2021 IL App (1st) 201136, ¶ 28. It is well established that we defer to the trier of fact since " 'the trial court is in a superior position to assess the credibility of witnesses and weigh the evidence.' " *In re Julian K.*, 2012 IL App (1st) 112841, ¶ 66

(quoting *In re Stephen K.*, 373 Ill. App. 3d 7, 25 (2007)). We will not substitute our judgment for that of the fact finder. *In re Marriage of Anderson*, 409 Ill. App. 3d 191, 199 (2011).

¶ 67    In its petition to permanently terminate parental rights, filed on October 10, 2018, the State argued that Isabel is unfit pursuant to two statutory grounds, in that:

> "m. She has failed to make reasonable efforts to correct the conditions which were the basis for the removal of the child from them and/or have failed to make reasonable progress toward the return of the child to them within 9 months after the adjudication of neglect or abuse under the Juvenile Court Act, or after an adjudication of dependency under the Juvenile Court Act, and/or within any 9 month period after said finding, in violation of 750 ILCS 50/1(D)(m) and 705 ILCS 405/2-29.

> p. She is unable to discharge parental responsibilities because of mental impairment, illness, or retardation as defined in 405 ILCS 5/1-116, and/or is developmentally disabled as defined in 405 ILCS 5/1-106, and there is sufficient justification to believe that such inability to discharge parental responsibilities shall extend beyond a reasonable time, in violation of 750 ILCS 50/1(D)(p) and 705 ILCS 405/2-29."

¶ 68    In an order dated October 26, 2021, the court found that the State had demonstrated, by clear and convincing evidence, that Isabel is unfit pursuant to sections 1(D)(m) and 1(D)(p) of the Adoption Act. Isabel disputes both grounds in this appeal, arguing first that she made satisfactory progress towards reunification. In support of her argument, she cites the testimonies of Cruz and Collins, who both testified that Isabel made progress in the services provided to her by DCFS. Additionally, Isabel emphasizes that she has consistently and faithfully engaged in visitation and

completed her assigned services, highlighting that she made meaningful progression in her services even though the services offered to her were inadequate.

¶ 69    As she did before the trial court, Isabel argues that the services DCFS offered her were inadequate, where caseworkers spoke to her in English instead of Spanish and she was not offered all services initially listed in various service plans. As previously noted, the various permanency orders entered by the trial court were interlocutory and nonfinal. See *In re Joseph J.*, 2020 IL App (1st) 190305, ¶ 24. In order to obtain review of a permanency order (and, by extension, the court's findings that DCFS made reasonable efforts to facilitate the achievement of the permanency goal), a petition must be filed within 14 days of the entry of a permanency order to obtain review. *Id.*; Ill. S. Ct. R. 306(a)(5), (b)(1) (eff. Nov. 1, 2017). No such petition regarding any of the permanency orders was filed in this case. Accordingly, this court lacks jurisdiction to review this claim.

¶ 70    Illinois courts have defined " 'reasonable progress' " as " 'demonstrable movement toward the goal of reunification.' " *In re D.D.*, 2022 IL App (4th) 220257, ¶ 38 (quoting *In re Reiny S.*, 374 Ill. App. 3d 1036, 1046 (2007)). The First District has explained that reasonable progress exists when the trial court " 'can conclude that *** the court, in the *near future*, will be able to order the child[ren] returned to parental custody.' " (Emphasis in original.) *Id.* (quoting *In re L.L.S.*, 218 Ill. App. 3d 444, 461 (1991)). "Reasonable progress" is measured by an objective standard. *Id.*

¶ 71    Contrary to Isabel's arguments, the trial court's findings that she failed to make reasonable progress were clearly supported by the evidence. At the termination hearing, the trial court heard evidence that, during the relevant nine-month period (October 5, 2017, through July 5, 2018), investigators, case workers, and Isabel's parenting coach all acknowledged concerns they had regarding interactions they observed between Isabel and A.R. during visitation. These concerns

included Isabel needing consistent reminders for the regular, basic care of A.R. (remembering to feed and change Isabel). Further, hygiene issues (*i.e.*, Isabel failing to wash her hands after changing dirty diapers or before feeding A.R.) remained a major concern, as A.R.'s physical health relies upon good hygiene and protection from viruses. Moreover, both Cruz and Vance recalled various safety incidents when Isabel failed to identify and rectify potentially dangerous situations. All these concerns were routinely communicated to Isabel, and she was coached to make better decisions. Nonetheless, the same issues continued to recur during the entire relevant nine-month period.

¶ 72    Clearly, Isabel loves her daughter deeply and desires to care for her. Every individual who testified at the termination proceedings attested to the special connection Isabel and A.R. share. The trial court acknowledged that Isabel had made reasonable *efforts* by completing numerous services and engaging in visitation with A.R. However, the court concluded she was unable to make reasonable *progress* towards reunification with A.R. because, despite those efforts, Isabel is unable to meet the basic requirements of daily care for A.R. and cannot overcome the trauma of her earlier experiences nor maintain the rigorous medical needs of A.R. There is a distinct difference between reasonable efforts and reasonable progress. The pertinent question is not whether Isabel has successfully completed the services assigned to her; it is whether her efforts in completing these services resulted in "reasonable progress" toward the return home of A.R. See *In re D.L.*, 2022 IL App (1st) 220222, ¶¶ 78-79 (Mikva, P.J., dissenting). While Isabel has displayed continuous effort and desire to care for A.R., she simply lacks the ability to care for A.R. and A.R.'s medical needs and has failed to make reasonable progress towards A.R.'s return home. It is well established that a parent can be unfit without fault. See *In re Devine*, 81 Ill. App. 3d 314, 319 (1980); *In re K.S.T.*, 218 Ill. App. 3d 431, 435 (1991). The trial court recognized this and

acknowledged that, despite Isabel's efforts, she was unable, objectively, to make reasonable progress towards reunification.

¶ 73    Next, Isabel contends that the State's evidence did not provide tangible, solid proof of an immutable condition, as required by statute to find a parent unfit pursuant to ground (p) (750 ILCS 50/1(D)(p) (West 2020)). As we have previously concluded that Isabel failed to make reasonable progress towards A.R.'s return home during the nine-month period of October 5, 2017, through July 5, 2018, we need not address the second ground of unfitness. That fact notwithstanding, the clear and convincing evidence presented at the termination hearing, when viewed in its entirety, demonstrates that Isabel has significant cognitive delays, which directly impacts her ability to successfully, independently parent A.R. While this case was brought as the result of a tragic situation, and through no fault of Isabel, the evidence clearly indicated that Isabel was diagnosed with a mild intellectual disability (scoring below the threshold for borderline intellectual functioning and displaying evidence of adaptive functioning deficits and maladaptive behaviors). Further, Isabel's individualized assessment results demonstrated that Isabel's cognitive functioning level is within the very delayed range, and the percentile ranks for her communication, daily living skills, and socialization were 1%. Considering these factors and the multitude of evidence presented concerning A.R.'s advanced medical needs and the seriousness of her aggressive mitochondrial disorder, we conclude that the trial court's findings with respect to Isabel were not against the manifest weight of the evidence.

¶ 74    Accordingly, we find that there was ample evidence to clearly and convincingly support the trial court's finding that Isabel failed to progress towards reunification with A.R. Further, the record unambiguously supports the court's finding that Isabel is unfit due to her inability to discharge her parental responsibilities as a result of her intellectual disability. Not a single witness

testified that Isabel was equipped to care for A.R. and her extensive medical needs, despite the continuing efforts she made. As the evidence of Isabel's unfitness is uncontradicted, we have no choice but to affirm the trial court's finding.

¶ 75                                    2. Best Interests Finding

¶ 76        Isabel also challenges the court's finding that it was in A.R.'s best interests to terminate her parental rights. The State disagrees and maintains that the court's finding was proper.

¶ 77        After a trial court has deemed a parent to be unfit, the court must then conduct a second hearing to determine if termination of the parental rights is in the child's best interests. 705 ILCS 405/2-29(2) (West 2020); *In re D.F.*, 201 Ill. 2d at 495. At this phase, "the parent's interest in maintaining the parent-child relationship must yield to the child's interest in a stable, loving home life." *In re D.T.*, 212 Ill. 2d 347, 364 (2004). The State must prove by a preponderance of the evidence that termination is in the minor's best interests. *In re Keyon R.*, 2017 IL App (2d) 160657, ¶ 16. A reviewing court will not reverse a trial court's decision to terminate parental rights unless it is contrary to the manifest weight of the evidence. *In re M.C.*, 2018 IL App (4th) 180144, ¶ 35. The court's decision will be found to be "against the manifest weight of the evidence only if the opposite conclusion is clearly apparent or the decision is unreasonable, arbitrary, or not based on the evidence." *In re Keyon R.*, 2017 IL App (2d) 160657, ¶ 16.

¶ 78        In the present case, the evidence adduced demonstrated that A.R. has resided with her foster parents since she was approximately four weeks old. She has intensely bonded with them, knows them as her parents, has a strong connection with her siblings, and spends time with her foster parents' extended family members. Lofton testified repeatedly that A.R.'s foster home is a safe and appropriate setting, with no signs of abuse, neglect, or corporal punishment. She stated she believes that adoption is in A.R.'s best interests since (1) the foster home is the only home A.R.

has ever known, (2) her foster parents are very dedicated and have been strong advocates for A.R., (3) they ensure A.R. receives all services and medical care that she requires, and (4) it offers long-term stability. She further attested that she had witnessed a strong bond between Isabel and A.R.'s foster family and has observed no hesitancy regarding maintaining that relationship.

¶ 79    Sheila and Ross both testified that they have a very strong desire to adopt A.R. and do not wish to be her guardians (due to an earlier experience they recounted in detail). Sheila is a registered nurse who has practiced in high-risk nursery care and has taken great steps to educate herself regarding A.R.'s diagnosis of Leigh syndrome. Sheila and Ross have ensured that A.R. continues to receive a wide array of medical, developmental, and therapeutic services. Further, both Sheila and Ross testified that they are committed to keeping Isabel and A.R.'s relationship intact and would be assertive in maintaining their connection. They are sensitive to maintaining and building A.R.'s connection to her heritage and identity. Moreover, the court ordered permanency evaluation also noted that it is essential to A.R.'s current and long-term well-being that she remain in the care of Sheila and Ross.

¶ 80    As did the juvenile court, we recognize Isabel's obvious love for A.R. and her desire to raise her. But the paramount issue nonetheless remains the best interests and welfare of A.R. "A child is no less exposed to danger, no less dirty or hungry because [her] parent is unable rather than unwilling to give [her] care." *In re Devine*, 81 Ill. App. 3d at 320. A.R. is in a safe, loving home, her complex medical needs are being met, and she is thriving in her current placement. Here, the trial court appropriately considered all statutory best interest factors and determined, with A.R.'s advanced medical complexities and her strong bond with her foster family, that the evidence demonstrated that it was in A.R.'s best interests to terminate Isabel's parental rights.

Considering the evidence and the best interests of A.R., we find the trial court's order terminating Isabel's parental rights was not against the manifest weight of the evidence.

¶ 81                                    IV. CONCLUSION

¶ 82        Based on the foregoing reasons, we affirm the trial court's dispositional orders.

¶ 83        Affirmed.

*In re A.R.*, 2023 IL App (1st) 220700

| | |
|---|---|
| **Decision Under Review:** | Appeal from the Circuit Court of Cook County, No. 16-JA-468; the Hon. Andrea Buford, Judge, presiding. |
| **Attorneys for Appellant:** | Sharone R. Mitchell Jr., Public Defender, of Chicago (Marsha Watt, Assistant Public Defender, of counsel), for appellant. |
| **Attorneys for Appellee:** | Kimberly M. Foxx, State's Attorney, of Chicago (Enrique Abraham, Victoria L. Kennedy, and Gina DiVito, Assistant State's Attorneys, of counsel), for appellees. |
| | Charles P. Golbert, Public Guardian, of Chicago (Carrie Fung, of counsel), guardian *ad litem*. |