NOTICE
This Order was filed under
Supreme Court Rule 23 and is
not precedent except in the
limited circumstances allowed
under Rule 23(e)(1).

2025 IL App (4th) 241212-U

NO. 4-24-1212

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
February 6, 2025
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| *In re* J.A., M.A., and S.A., Minors | ) | Appeal from the |
| | ) | Circuit Court of |
| (The People of the State of Illinois, | ) | McLean County |
|     Petitioner-Appellee, | ) | No. 22JA56 |
|     v. | ) | |
| Sarah A., | ) | Honorable |
|     Respondent-Appellant). | ) | J. Brian Goldrick, |
| | ) | Judge Presiding. |

JUSTICE DOHERTY delivered the judgment of the court.
Justices Zenoff and Grischow concurred in the judgment.

**ORDER**

¶ 1     *Held*: The trial court's fitness and best-interest determinations were not against the manifest weight of the evidence.

¶ 2     In April 2024, the State filed a motion to terminate the parental rights of respondent Sarah A. as to her minor children, S.A. (born in 2016), J.A. (born in 2012), and M.A. (born in 2009). The children's fathers are not parties to this appeal. In September 2024, the trial court granted the State's petition and terminated respondent's parental rights.

¶ 3     Respondent appeals, arguing the trial court's fitness and best-interest determinations were against the manifest weight of the evidence. We affirm.

¶ 4     I. BACKGROUND

¶ 5     In June 2022, the State filed a petition to adjudicate the children neglected under section 2-3(1)(b) of the Juvenile Court Act of 1987 (Juvenile Court Act) (705 ILCS 405/2-3(1)(b)

(West 2022)), alleging that the children were in an environment injurious to their welfare. The State alleged (1) respondent had unresolved domestic violence and anger management issues that created a risk of harm to the children and (2) she and the children had continuing contact with Henry D., a person with a history of domestic violence and who respondent knew had inappropriately touched M.A. The record shows respondent is deaf and had an interpreter at all trial court appearances.

¶ 6        Respondent was not present at the hearing on the petition. The trial court considered a report showing that, on March 24, 2022, the Illinois Department of Children and Family Services (DCFS) received a report describing verbal and physical altercations between respondent, M.A., and other members of the family, including an incident where M.A. allegedly struck J.A. and bloodied her nose.

¶ 7        On April 26, 2022, DCFS received a report indicating respondent suspected M.A. might be pregnant by Henry and  disclosed that she had witnessed Henry inappropriately touching M.A. on multiple occasions. On April 27, 2022, a child protection specialist, Alexus Hobbs, attempted to visit respondent and the children at a hotel, where respondent refused entry to their hotel room. Hobbs noted visible bruises on respondent, who reported that Henry had recently assaulted her. Respondent said she did not report the incident to avoid complications with an upcoming court case. Respondent also told M.A. to tell Hobbs that Henry touched M.A.'s breast and butt area. M.A. later confirmed the details of Henry's conduct in an interview with the McLean County Children's Advocacy Center. On May 10, 2022, DCFS received a report involving a bruise on S.A.'s arm that respondent advised S.A. to keep covered at school.

¶ 8        In June 2022, DCFS received additional domestic violence reports, including allegations that respondent failed to secure an order of protection against Henry and that he still

had contact with her. Respondent was subsequently unable to be located. On June 21, 2022, M.A. was found at a friend's home and taken into custody. J.A. and S.A. could not be located.

¶ 9    The trial court placed the children in the temporary custody of DCFS and issued a warrant for the apprehension of J.A. and S.A. in order to place them in DCFS custody. On June 29, 2022, the court renewed the temporary custody order following a hearing, with respondent present. J.A. and S.A. had been found and were in the temporary custody of DCFS. On August 24, 2022, the court adjudicated the children neglected, found respondent unfit, made the children wards of the court, and placed guardianship and custody with DCFS.

¶ 10    On April 23, 2024, the State filed a petition for termination of parental rights, alleging respondent was unfit under section 1(D)(m)(ii) of the Adoption Act (750 ILCS 50/1(D)(m)(ii) (West 2022)) for failing to make reasonable progress toward the return of the children to her care during a nine-month period after the adjudication of neglect. The State alleged one nine-month period from April 25, 2023, to January 25, 2024.

¶ 11    On September 11, 2024, the trial court held a fitness hearing. Emily Hartman, the current caseworker on the matter, testified regarding respondent's compliance with her service plan. Respondent's goals included addressing (1) mental health, (2) domestic violence, (3) employment, (4) housing, (5) parenting, and (6) cooperation. As of April 25, 2023, referrals had been made for all of the goals, and respondent was engaging in services through the Chicago Hearing Society (CHS). The record shows she also engaged in services through an organization known as Deaf Hope. The children were residing in foster care with their maternal aunt, Jacquelyn B.

¶ 12    Shortly after April 25, 2023, the beginning of the nine-month period at issue, respondent wrongly believed Hartman was dating respondent's nephew, changing her name and

appearance, and purposely deceiving respondent. Hartman testified she had only met respondent's nephew in passing. Respondent's inaccurate beliefs made it difficult for Hartman to work with respondent because respondent would not share information with her. Respondent continued to believe Hartman was deceiving her, even after others intervened and provided information to show respondent's beliefs were inaccurate. Hartman described respondent as "coming across as very paranoid."

¶ 13    Respondent completed the parenting portion of her goals before April 15, 2023. After April 25, 2023, however, she wanted an interpreter at supervised visits with the children. Hartman's understanding was the visits would continue while she found interpreters, but respondent did not attend for "a couple of weeks that turned maybe into months," until Hartman found interpreters. Afterward, visits were inconsistent, sometimes because respondent would not always confirm the day before, which was necessary for an interpreter to be present.

¶ 14    Hartman testified that the agency had concerns about respondent discussing inappropriate topics during visits and not engaging with the children. Some visits were appropriate, but the agency was concerned respondent was not exhibiting consistent parenting skills. No progress was made on family therapy during the nine-month period. However, this was because M.A. was not ready to engage in family therapy.

¶ 15    The trial court ordered a psychological evaluation during the relevant nine-month period. However, respondent refused to sign consent papers for the evaluation multiple times, until she finally did so on January 25, 2024.

¶ 16    Regarding housing, respondent lived with her adult son for the majority of the nine-month period, sleeping on his couch. Respondent was then asked to leave and stayed at hotels or churches. Respondent was also offered services by the Family Community Resource Center

(FCRC) to seek housing but would fail to show up for appointments. FCRC discontinued working with respondent after she refused to sign consents for a psychological evaluation, which FCRC viewed as lack of cooperation with a court order. While Hartman believed respondent was employed and earned enough to obtain housing, respondent also failed to give Hartman documents to verify her employment and would not give Hartman her address.

¶ 17    Regarding domestic violence counseling, Hartman testified respondent attended sessions but also continued to have contact with Henry, who had been incarcerated based on a domestic incident involving respondent. Henry was released in February 2023. Hartman became aware of a relationship between Henry and respondent in August 2023. In October 2023, there were multiple domestic violence incidents between the two, with at least two resulting in police reports being filed. Henry was then arrested. Respondent did not obtain an order of protection against Henry until January 25, 2024. In June 2024, respondent had the order vacated or dismissed.

¶ 18    Hartman testified that respondent's cooperation became progressively worse over the nine-month period. Respondent wanted Hartman to communicate only through e-mail, and there were times respondent would block Hartman's phone number without informing Hartman. Respondent would unblock the number but then block it again, even after it was discussed in the trial court that she should not do so. On occasions when Hartman tried to call through a video connection that would connect with an interpreter, respondent was unavailable. There were also multiple times during the nine-month period where respondent became verbally aggressive toward Hartman, resulting in Hartman asking a supervisor to accompany her to meetings with respondent. At one meeting, respondent had to be escorted from the building.

¶ 19    Hartman testified that she did not believe respondent was able to acknowledge or take accountability for the reasons her children were taken into DCFS custody. She noted there

were times respondent admitted Henry was a dangerous person, but then she remained in a relationship with him. Hartman testified the agency was concerned respondent did not understand the impact the case had on her children and that she could not get past her own issues in order to provide a stable, consistent, and loving home for them. Hartman also expressed concern the children could not be safely retuned to respondent because of her ongoing relationship with Henry. Hartman acknowledged that Henry was currently incarcerated.

¶ 20    The trial court found the State proved respondent unfit by clear and convincing evidence based on her failure to make reasonable progress toward the return of the children in the nine-month period at issue. The court found respondent failed to cooperate with DCFS, even when admonished by the court to do so. The court also emphasized respondent's failure to verify housing and employment, something the court felt was a simple task that required no special accommodation. A reasonable inference, the court concluded, was that respondent had something to hide. The court also noted times when respondent missed visitation unrelated to the periods where Hartman was finding interpreters and considered that respondent acted inappropriately at some visitation sessions. The court particularly found respondent had been "completely unsuccessful" in controlling her anger and cutting ties with Henry. Respondent refused to sign consents for a psychological evaluation and would not comply with the court's orders. Most important, the court found respondent's failure to address issues of domestic violence and her maintenance of a relationship with Henry showed an inability to make progress toward safely returning the children to her care. Thus, the court found respondent unfit.

¶ 21    The trial court next moved to the best-interest portion of the hearing. Jacquelyn B. testified about her relationship with the children and their adjustment to her home. She stated her household, which included her two adult children, provided the children with a stable environment,

routine, and affection. Jacquelyn provided for the children's educational, medical, and other needs. The children were bonded to Jacquelyn and her adult children. Jacquelyn testified that the father of M.A. and J.A., who was actively involved in their lives, would remain in contact with the children, and she was open to contact with respondent if it was appropriate. However, she stated that such contact would likely not be appropriate if respondent continued to see Henry.

¶ 22        Nora B., the children's maternal grandmother, testified about her consistent involvement with the children before and after DCFS intervened. She described how she supported respondent with household tasks and, since the children's placement, increased her involvement to provide stability for the children. Nora testified that she worked nights, allowing her to share caregiving responsibilities with Jacquelyn.

¶ 23        Lamontae Westley, respondent's friend, testified respondent was good with her children and took good care of them. He testified Nora was mean to respondent and suggested Nora and Jacquelyn were abusive to respondent and discriminated against her because she was deaf. However, he refused to elaborate when asked to provided details. Westley admitted he had not seen respondent in person since 2017 but said he frequently communicated with respondent via video calls. He also had blocked respondent from calling him for a time because he was "having [his] own issues with court." Westley had seen Henry abuse respondent during video calls.

¶ 24        Respondent testified she was currently employed part-time and had an apartment. She described Jacquelyn and Nora as abusive. Respondent testified she previously obtained orders of protection against Henry. She said she learned a lot from classes concerning domestic violence but did not tell her caseworker that. She also testified she was attending counseling and taking medication for anxiety. Respondent stated she was concerned J.A. had dry skin when she saw him at visitations and S.A. was often sick and had a problem with his teeth. She addressed the reasons

for missing visits and said she provided the children with gifts and money.

¶ 25    Respondent maintained that Hartman was not who she claimed to be and testified Hartman discriminated against her because she was deaf. When respondent was asked if she was ready to have the children returned to her, she said M.A. needed counseling first and, "I want to give the kids time." On cross-examination, respondent admitted she did not have a current order of protection against Henry but stated she had the paperwork filled out to obtain one. She said she would move to a different state before he was released from jail.

¶ 26    After testimony concluded, respondent suggested Henry was present on a television screen, and the trial court noted that was untrue. Respondent then made accusations regarding fake names and said she would bring the matter up in civil court. Respondent repeatedly interrupted closing arguments, causing the court to repeatedly warn her she would be removed from the courtroom if she continued to interrupt.

¶ 27    The trial court stated that it did not base any decision on the disability of any parent, and the fact respondent was deaf did not factor into the court's ruling. The court found the State proved by a preponderance of the evidence it was in the best interest of the children to terminate respondent's parental rights. The court addressed the required statutory best-interest factors, finding "an overwhelming number of factors" supported termination of parental rights. The court found particularly important the need for permanence and the physical safety and welfare of the children. The court found respondent could not provide that, given her history with Henry. The court did not believe respondent's testimony to the contrary. The court also noted respondent's mental health issues and referenced her unreasonable belief the caseworker used a false name and that Henry was present on a screen in the courtroom. The court also found the children were bonded with Jacquelyn and their placement with her provided security. The court terminated respondent's

parental rights and set the permanency goal for S.A to adoption.

¶ 28        This appeal followed.

¶ 29                           II. ANALYSIS

¶ 30        On appeal, respondent argues the trial court erred in finding the State proved she was unfit by clear and convincing evidence and that it was in the best interest of the children to terminate her parental rights.

¶ 31                       A. Fitness Determination

¶ 32        Under section 2-29(2) of the Juvenile Court Act (705 ILCS 405/2-29(2) (West 2022)), the involuntary termination of parental rights is a two-step process. First, the State must prove by clear and convincing evidence the parent is "unfit," as defined in the Adoption Act. *In re Donald A.G.*, 221 Ill. 2d 234, 244 (2006). If the State proves unfitness, it then must prove by a preponderance of the evidence that termination of parental rights is in the best interest of the children. *In re D.T.*, 212 Ill. 2d 347, 363-66 (2004).

¶ 33        A determination of parental unfitness involves factual findings and credibility determinations that the trial court is in the best position to make because "the trial court's opportunity to view and evaluate the parties *** is superior." (Internal quotation marks omitted.) *In re M.I.*, 2016 IL 120232, ¶ 21. A trial court's finding of parental unfitness will not be reversed unless it is against the manifest weight of the evidence. *In re N.G.*, 2018 IL 121939, ¶ 29. A decision is against the manifest weight of the evidence only when the opposite conclusion is clearly apparent. *Id.*

¶ 34        The trial court found respondent failed to make reasonable progress toward the return of the children during any nine-month period following the adjudication of neglect. See 750 ILCS 50/1(D)(m)(ii) (West 2022). Illinois courts have defined "reasonable progress" as

"demonstrable movement toward the goal of reunification." (Internal quotation marks omitted.) *In re Reiny S.*, 374 Ill. App. 3d 1036, 1046 (2007). This court has explained reasonable progress exists when a trial court "can conclude that *** the court, in the *near future*, will be able to order the child returned to parental custody." (Emphasis in original.) *In re L.L.S.*, 218 Ill. App. 3d 444, 461 (1991). " 'Reasonable progress' is measured by an objective standard." *In re A.R.*, 2023 IL App (1st) 220700, ¶ 70.

¶ 35    Here, there was ample evidence respondent failed to make reasonable progress toward reunification. Respondent engaged in a pattern of behavior in which she continued her relationship with Henry, despite repeated instances of domestic violence. She also failed to show progress in obtaining suitable housing and maintaining employment because she failed to provide her address or proof of employment to her caseworker. She further expressed fanciful and unreasonable beliefs about her caseworker. She additionally exhibited problems cooperating with agencies, engaged in verbally abusive behavior, and behaved inappropriately at some visits with the children. Moreover, she refused to sign consents for a psychological evaluation which might have addressed those issues, despite the trial court ordering her to do so.

¶ 36    We recognize respondent argues that she faced challenging circumstances because she is deaf and had limited resources. However, because the failure to make reasonable progress is measured by an objective standard, those circumstances are not determinative. Further, respondent had specific resources to aid those circumstances, such as CHS and Deaf Hope.

¶ 37    Given respondent's lack of progress on most of her goals, the State showed respondent could not progress to a return of the children in the near future. Accordingly, the court's determination respondent failed to make reasonable progress toward the return of the children was not against the manifest weight of the evidence.

¶ 38                                    B. Best-Interest Determination

¶ 39            Respondent next contends the trial court's best-interest determination was "unduly

harsh," arguing the court should have considered guardianship with continued visitation to allow

respondent to retain her parental rights.

¶ 40            When a trial court finds a parent unfit, "the court then determines whether it is in

the best interests of the minor that parental rights be terminated." *D.T.*, 212 Ill. 2d at 352. "[A]t a

best-interests hearing, the parent's interest in maintaining the parent-child relationship must yield

to the child's interest in a stable, loving home life." *Id.* at 364. The State must prove by a

preponderance of the evidence termination of parental rights is in the minor's best interest. *Id.* at

366. In making the best-interest determination, the court must consider the factors set forth in

section 1-3(4.05) of the Juvenile Court Act (705 ILCS 405/1-3(4.05) (West 2022)). These factors

include:

> "(1) the child's physical safety and welfare; (2) the development of
>
> the child's identity; (3) the child's background and ties, including
>
> familial, cultural, and religious; (4) the child's sense of attachments,
>
> including love, security, familiarity, and continuity of affection, and
>
> the least-disruptive placement alternative; (5) the child's wishes;
>
> (6) the child's community ties; (7) the child's need for permanence,
>
> including the need for stability and continuity of relationships with
>
> parental figures and siblings; (8) the uniqueness of every family and
>
> child; (9) the risks related to substitute care; and (10) the preferences
>
> of the persons available to care for the child." *In re Jay. H.*, 395 Ill.
>
> App. 3d 1063, 1071 (2009) (citing 705 ILCS 405/1-3(4.05) (West

2008)).

"The court's best interest determination [need not] contain an explicit reference to each of these factors, and a reviewing court need not rely on any basis used by the trial court below in affirming its decision." *In re Tajannah O.*, 2014 IL App (1st) 133119, ¶ 19. On review, "[w]e will not disturb a court's finding that termination is in the [child's] best interest unless it was against the manifest weight of the evidence." *In re T.A.*, 359 Ill. App. 3d 953, 961 (2005).

¶ 41       Here, the evidence demonstrated the children had strong bonds with their foster family. Jacquelyn provided for the children's needs and provided safety and security. As the trial court noted, the provision of a safe environment was particularly important, given respondent's pattern of remaining in a relationship with Henry. While respondent testified that she would leave the state, the court found she lacked credibility based on her pattern of past behavior. The court considered the evidence in relation to the statutory best-interest factors and found all of them overwhelmingly weighed in favor of terminating respondent's parental rights.

¶ 42       Respondent does not argue the factors weighed in her favor and even admitted she wanted to give the children time before any reunification. Instead, she merely suggests the trial court should have chosen another option. We cannot conclude the evidence in the record "clearly calls for the opposite finding" or is such that "no reasonable person" could find as the court found. (Internal quotation marks omitted.) *In re J.H.*, 2020 IL App (4th) 200150, ¶ 68. Accordingly, the court's best-interest determination was not against the manifest weight of the evidence.

¶ 43                              III. CONCLUSION

¶ 44       For the reasons stated, we affirm the trial court's judgment.

¶ 45       Affirmed.