NOTICE
This Order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

2025 IL App (4th) 250617-U

NOS. 4-25-0617, 4-25-0618 cons.

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
November 10, 2025
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| *In re* T.M. and H.M., Minors | ) | Appeal from the |
| | ) | Circuit Court of |
| (The People of the State of Illinois, | ) | Sangamon County |
|       Petitioner-Appellee, | ) | Nos.  22JA190 |
|       v. | ) |       22JA191 |
| Kenneth M., | ) | |
|       Respondent-Appellant). | ) | Honorable |
| | ) | Karen S. Tharp, |
| | ) | Judge Presiding. |

JUSTICE ZENOFF delivered the judgment of the court.
Presiding Justice Harris and Justice Knecht concurred in the judgment.

**ORDER**

¶ 1    *Held*:  The appellate court affirmed, finding the trial court's fitness and best-interest determinations were not against the manifest weight of the evidence.

¶ 2    In September 2022, the State filed petitions to adjudicate respondent Kenneth M.'s minor children, T.M. (born in 2019) and H.M. (born in 2021), neglected. In January 2023, the trial court adjudicated the children neglected, found respondent unfit, made the children wards of the court, and placed guardianship and custody of the children with the Illinois Department of Children and Family Services (DCFS). The children's mother, Peggy H., is not a party to this appeal.

¶ 3    In October 2024, the State filed motions to terminate parental rights. In June 2025, the trial court granted the State's motions and terminated respondent's parental rights.

¶ 4    Respondent appeals, arguing the trial court's fitness and best-interest

determinations were against the manifest weight of the evidence. We affirm.

¶ 5                                  I. BACKGROUND

¶ 6         In September 2022, the State filed petitions to adjudicate the children neglected

under section 2-3(1)(b) of the Juvenile Court Act of 1987 (Juvenile Court Act) (705 ILCS

405/2-3(1)(b) (West 2022)), alleging that they were in an environment injurious to their welfare

because of domestic violence between respondent and Peggy.

¶ 7         In January 2023, respondent stipulated the State could prove the allegations in the

petitions. The trial court entered a dispositional order adjudicating the children neglected, found

respondent unfit, made the children wards of the court, and placed guardianship and custody of

the children with DCFS.

¶ 8         In October 2024, the State filed motions for termination of parental rights,

alleging respondent was unfit for (1) failure to maintain a reasonable degree of interest, concern,

or responsibility as to the children's welfare (750 ILCS 50/1(D)(b) (West 2024)); (2) failure to

make reasonable efforts to correct the conditions that were the basis for the removal of the

children during a nine-month period after the adjudication of neglect (750 ILCS 50/1(D)(m)(i)

(West 2024)); (3) failure to make reasonable progress toward the return of the children to his

care during a nine-month period after the adjudication of neglect (750 ILCS 50/1(D)(m)(ii)

(West 2024)); (4) abandonment of the children (750 ILCS 501/1(D)(a) (West 2024)) and;

(5) desertion of the children for more than three months preceding the commencement of the

motion (750 ILCS 50/1(D)(c) (West 2024)). The State alleged three nine-month periods of

January 25, 2023, to October 25, 2023, October 25, 2023, to July 25, 2024, and January 25,

2024, to October 25, 2024.

¶ 9         In January and April 2025, the trial court held a fitness hearing. The record

showed a history of domestic violence between respondent and Peggy. In 2021, another case involving the children had been opened because of a domestic violence incident.

¶ 10　　　　Caseworker Jamea Scott testified she was assigned to the current case from May 2022 to September 2024. Scott testified the children originally came into care due to domestic violence issues in the home. Respondent's goals included addressing (1) parenting, (2) cooperation, (3) housing, (4) income, (5) mental health, (6) substance abuse, (7) visitation, and (8) domestic violence.

¶ 11　　　　Scott testified Peggy initially made reasonable progress, but that progress stopped around six months after she gave birth in July 2023 to M.M., another child fathered by respondent.

¶ 12　　　　During the time Scott was the caseworker, respondent told her he was in a relationship with Peggy, but Peggy would tell Scott they were not in a relationship. However, Peggy admitted to being in a relationship with respondent in 2023. In addition, at some point after M.M. was born, Peggy told her they were planning to become engaged.

¶ 13　　　　Although respondent had completed domestic violence services, in August 2024, he went to Peggy's home seeking money. That led to an incident of domestic violence. Respondent's child, A.M., who was the children's half-sibling, was present during the incident. Respondent was arrested and M.M. was taken into protective custody. A.M. was also later removed from respondent's care.

¶ 14　　　　Scott testified that respondent completed all of his services, except he would not submit to drug screens. Respondent admitted to Scott that he had a problem with alcohol.

¶ 15　　　　Scott stated respondent completed only 1 of 29 random drug tests because he said he was doing drug testing as part of his probation. However, Scott stated the probation drug tests

were not random and could not count toward the tests required by DCFS. Scott testified she discussed her concerns about respondent missing tests with him and offered transportation. She said respondent told her he did not want to get in a car with her. When asked to provide a hair follicle, respondent offered a pubic hair. There was evidence respondent failed drug tests in June and September 2024.

¶ 16 Bridget Mahan testified she was the current caseworker and was assigned to the case beginning in October 2024. Mahan testified respondent and Peggy were not supposed to be in contact with one another. Peggy was required to obtain an order of protection and initially did so, but it was dismissed after she failed to appear for a hearing on the matter. Peggy said she would not get an order of protection because she feared retaliation from respondent.

¶ 17 In January 2025, Mahan stopped by respondent's house unannounced and saw Peggy's vehicle in respondent's driveway and took photos of it. Mahan testified respondent came outside and gave her information about his substance abuse treatment. Afterward, respondent texted Mahan and said he was going to get an order of protection against her because she was harassing him. Mahan responded that she was just trying to set up visits with the children. Mahan scheduled supervised visits in February and March that respondent attended. Prior to that, he had not had consistent visits with the children.

¶ 18 Katelyn Hoban testified she worked as a case aide on the matter. Hoban testified she witnessed Peggy exit respondent's home in Chestnut, Illinois, in May 2024 during a supervised visit. Peggy said she stopped there to use the restroom on her way to a store in Decatur, Illinois. The record indicates Peggy lived in Springfield, Illinois, at that time.

¶ 19 Hoban testified respondent appeared to be intoxicated during a May 31, 2024, visit with the children. Respondent ended the visit early that day and seemed irritated and

- 4 -

agitated. Hoban testified respondent was agitated during most visits and did not interact with the children much. However, she admitted there were times respondent did interact with the children in a positive manner.

¶ 20    In June 2024, Hoban saw respondent arrive for a visit, driving with A.M., when she believed respondent's license was suspended. During the visit, respondent started a fire in a barbecue pit and told A.M. he was in charge of keeping the other children away from the fire. Respondent then left for over 20 minutes. When he returned, H.M. had soiled her pants. Respondent said he was not comfortable changing H.M., so Hoban cleaned H.M. up. Hoban said A.M. also cared for the children during other visits by bringing them food and doing most of the playing with them.

¶ 21    Later in June 2024, visits between respondent and the children were moved to an office because of concerns respondent was intoxicated at the May 31, 2024, visit. Respondent canceled those visits because he did not have transportation.

¶ 22    Peggy testified she was no longer in a relationship with respondent. She told the trial court she ended her relationship with respondent in November or December 2023. Peggy admitted she had an order of protection against respondent in another county in December 2022 that she had asked the court to vacate.

¶ 23    Peggy testified she knew she was required to obtain an order of protection against respondent after the 2024 incident. She said she sought an order of protection following the incident but stated she thought it had been denied. The State then provided evidence Peggy withdrew the request for the order of protection on the same day it was entered.

¶ 24    When asked about the November 2024 order of protection, Peggy said she was not sure if she withdrew that one. The State then presented evidence she failed to appear at the

hearing on the matter. Peggy said she thought she had a visit with one of the children that day. She did not think she had any current orders of protection against respondent.

¶ 25        Peggy denied going to respondent's home in January 2025. She said her last contact with respondent was during the August 2024 incident. She testified she did not follow through on the previous orders of protection because respondent "hadn't been around," so she thought they were unnecessary. She also feared that filing them would bring him back into her life. Peggy said her father was providing positive support for her and encouraged her to stay away from respondent. She said she had no intention of maintaining a relationship with respondent.

¶ 26        Respondent testified he completed drug tests as part of his probation. He said he offered a pubic hair for testing because he did not have hair on his head. He admitted he tested positive for amphetamine and cannabis in September 2024. Respondent stated he had relapsed and entered inpatient treatment in December 2024. He testified he successfully completed the treatment program. He currently was attending outpatient services, doing weekly drug tests, and attending Alcoholics Anonymous meetings.

¶ 27        Respondent testified he was self-employed as a handyman and had also obtained new employment moving freight boxes for a company. He had completed all of the classes and services required by DCFS. He stated he had adequate housing.

¶ 28        Respondent testified his relationship with Peggy ended in August 2024, and she had not tried to contact him. He testified Peggy did not visit him at his home in January 2025. Instead, he said the vehicle spotted there belonged to Peggy's father, who had brought it there to have respondent fix the brakes. However, he admitted he had been punched in the face by Peggy's father in August 2024.

¶ 29        Respondent stated he had a key to Peggy's house at the time of the August 2024 incident. The locks had not been changed. After the incident, respondent was arrested, and A.M. was then removed from his care.

¶ 30        At the time of the first hearing, respondent said he had not visited the children in around a year. He stated he had not seen his caseworker and did not have a vehicle to attend visits. He testified he was told Peggy could not be around him and they used to attend visits together. He testified his caseworker did not contact him and said, "I have reached out to them and they don't do nothing." When respondent previously visited the children, the visits were supervised. Respondent said he loved his children and wanted to have visits with them. When asked about the children's birthdays, respondent did not know H.M.'s birthday and incorrectly stated T.M.'s birthday.

¶ 31        The trial court found that the State proved respondent unfit by clear and convincing evidence based on respondent's failure to (1) maintain a reasonable degree of interest, concern, or responsibility as to the children's welfare; (2) make reasonable efforts to correct the conditions that were the basis for the removal of the children during a nine-month period after the adjudication of neglect; and (3) make reasonable progress toward the return of the children to his care during a nine-month period after the adjudication of neglect.

¶ 32        The trial court noted that, although Peggy and respondent said they had ended their relationship, Peggy was seen at respondent's home in May 2024 and had said she stopped there to use the restroom. The court took judicial notice of the locations of Springfield, Chestnut, and Decatur and stated that Chestnut was not on the path between Springfield and Decatur.

¶ 33        The trial court further noted, when the August 2024 domestic violence incident occurred, respondent had a key to Peggy's home, which had never had the locks changed. Then,

- 7 -

Peggy failed to obtain orders of protection, and her vehicle was seen at respondent's home in January 2025. The court found respondent's explanation that Peggy's father took the vehicle there was "wholly incredible." The court also found respondent's testimony lacked credibility overall.

¶ 34        The trial court further noted respondent's failed drug tests. The court also noted the periods of time respondent did not visit the children. However, the court stated it would not make a finding of abandonment or desertion.

¶ 35        On June 12, 2025, the trial court held the best-interest hearing. Mahan testified the children had been placed in the same traditional foster home for 11 months. M.M. was also placed in the same home. The children engaged in online calls and occasional visits with A.M.

¶ 36        Mahan testified the children were bonded to their foster parents. They called their foster parents "mom" and "dad" or "second mom" and "second dad." The foster parents provided for the children's educational, medical, emotional, and other needs, and they had signed a permanency commitment to adopt the children. Because of respondent's history of domestic violence and drug abuse, Mahan believed it was in the best interest of the children to terminate respondent's parental rights.

¶ 37        On cross-examination, Mahan stated she believed the children were also bonded to respondent. She admitted the children were usually happy to see respondent. Mahan testified the foster parents were willing to continue to send pictures of the children to respondent if they were adopted, but she did not know what, if any, contact they would be willing to engage in beyond that. Respondent did not testify or provide any evidence.

¶ 38        The trial court found the State proved by a preponderance of the evidence it was in the best interest of the children to terminate respondent's parental rights. The court addressed

the required statutory best-interest factors, finding they supported termination of parental rights. The court noted the children needed permanence, they were well cared for, and their placement provided them with security. The court noted the possibility of difficulties for the children if M.M. was later returned to Peggy's or respondent's care and that it was ideal to keep siblings together, but, ultimately, the court found it was inappropriate to wait to see what the outcome would be in M.M.'s case. Thus, on June 12, 2025, the court terminated respondent's parental rights and set the permanency goal for the children to adoption.

¶ 39 This appeal followed.

¶ 40 II. ANALYSIS

¶ 41 On appeal, respondent argues the trial court's fitness and best-interest determinations were against the manifest weight of the evidence.

¶ 42 A. Fitness Determination

¶ 43 Respondent first argues the trial court erred in finding the State proved him unfit by clear and convincing evidence.

¶ 44 Under section 2-29(2) of the Juvenile Court Act (705 ILCS 405/2-29(2) (West 2024)), the involuntary termination of parental rights is a two-step process. First, the State must prove by clear and convincing evidence the parent is "unfit," as defined in the Adoption Act. *In re Donald A.G.*, 221 Ill. 2d 234, 244 (2006). If the State proves unfitness, it then must prove by a preponderance of the evidence that termination of parental rights is in the best interest of the children. *In re D.T.*, 212 Ill. 2d 347, 363-66 (2004).

¶ 45 A determination of parental unfitness involves factual findings and credibility determinations that the trial court is in the best position to make because its "opportunity to view and evaluate the parties *** is superior." (Internal quotation marks omitted.) *In re M.I.*, 2016 IL

120232, ¶ 21. A trial court's finding of parental unfitness will not be reversed unless it is against the manifest weight of the evidence. *In re N.G.*, 2018 IL 121939, ¶ 29. A decision is against the manifest weight of the evidence only when the opposite conclusion is clearly apparent. *N.G.*, 2018 IL 121939, ¶ 29. "As the grounds for unfitness are independent, the trial court's judgment may be affirmed if the evidence supports the finding of unfitness on any one of the alleged statutory grounds." *In re H.D.*, 343 Ill. App. 3d 483, 493 (2003).

¶ 46　　　　　One of the grounds the trial court found for unfitness was that respondent failed to make reasonable progress toward the return of the children during any nine-month period following the adjudication of neglect. See 750 ILCS 50/1(D)(m)(ii) (West 2024). Illinois courts have defined "reasonable progress" as "demonstrable movement toward the goal of reunification." (Internal quotation marks omitted.) *In re Reiny S.*, 374 Ill. App. 3d 1036, 1046 (2007). This court has explained reasonable progress exists when a trial court "can conclude that *** the court, in the *near future*, will be able to order the child returned to parental custody." (Emphasis in original.) *In re L.L.S.*, 218 Ill. App. 3d 444, 461 (1991). " 'Reasonable progress' is measured by an objective standard." *In re A.R.*, 2023 IL App (1st) 220700, ¶ 70.

¶ 47　　　　　Here, there was sufficient evidence respondent failed to make reasonable progress toward reunification during the nine-month periods at issue. Although respondent completed nearly all of his services, he remained in contact with Peggy. The trial court specifically found respondent's testimony lacked credibility. The court then reasonably found Peggy was at respondent's home in May 2024 and a serious incident of domestic violence between respondent and Peggy occurred in August 2024. When that incident occurred, respondent had a key to Peggy's home, which had never had the locks changed. Following the incident, Peggy refused to obtain orders of protection. Then, her vehicle was seen at respondent's home in January 2025,

providing evidence she and respondent were not truthful about their relationship. Instead, the evidence showed respondent continued to see Peggy during the time periods at issue.

¶ 48 Further, respondent testified he had gone around a year without seeing the children. There was also evidence he was intoxicated at a visit and was at times inattentive or agitated during visits. He also had failed substance abuse tests on several occasions and failed to submit to testing on many others.

¶ 49 Given respondent's lack of progress and the evidence he continued to see Peggy during the time periods at issue, the State showed respondent could not progress to a return of the children in the near future. Accordingly, the trial court's determination respondent failed to make reasonable progress toward the return of the children was not against the manifest weight of the evidence.

¶ 50 B. Best-Interest Determination

¶ 51 Respondent next contends the trial court's best-interest determination was in error.

¶ 52 When a trial court finds a parent unfit, "the court then determines whether it is in the best interests of the minor that parental rights be terminated." *D.T.*, 212 Ill. 2d at 352. "[A]t a best-interests hearing, the parent's interest in maintaining the parent-child relationship must yield to the child's interest in a stable, loving home life." *D.T.*, 212 Ill. 2d at 364. The State must prove by a preponderance of the evidence termination of parental rights is in the minor's best interest. *D.T.*, 212 Ill. 2d at 366.

¶ 53 In making the best-interest determination, the trial court must consider the factors set forth in section 1-3(4.05) of the Juvenile Court Act (705 ILCS 405/1-3(4.05) (West 2024)). These factors include:

"(1) the child's physical safety and welfare; (2) the development of the child's identity; (3) the child's background and ties, including familial, cultural, and religious; (4) the child's sense of attachments, including love, security, familiarity, and continuity of affection, and the least-disruptive placement alternative; (5) the child's wishes; (6) the child's community ties; (7) the child's need for permanence, including the need for stability and continuity of relationships with parental figures and siblings; (8) the uniqueness of every family and child; (9) the risks related to substitute care; and (10) the preferences of the persons available to care for the child." *In re Jay. H.*, 395 Ill. App. 3d 1063, 1071 (2009) (citing 705 ILCS 405/1-3(4.05) (West 2008)).

"The court's best interest determination [need not] contain an explicit reference to each of these factors, and a reviewing court need not rely on any basis used by the trial court below in affirming its decision." *In re Tajannah O.*, 2014 IL App (1st) 133119, ¶ 19. On review, "[w]e will not disturb a court's finding that termination is in the [child's] best interest unless it was against the manifest weight of the evidence." *In re T.A.*, 359 Ill. App. 3d 953, 961 (2005).

¶ 54        Here, the trial court specifically referenced the statutory best-interest factors and found they weighed in favor of terminating respondent's parental rights. The evidence demonstrated the children had strong bonds with their foster parents and with M.M., who was placed in the same foster home. The children needed permanence, and the foster parents provided for the children's needs and provided safety and security.

¶ 55        The trial court recognized the possibility of difficulties for the children if M.M. was later returned to Peggy's or respondent's care and that it was ideal to keep siblings together, but, ultimately, the court found it was inappropriate to wait to see what the outcome would be in

M.M.'s case. The evidence in the record does not clearly call for the opposite finding, such that no reasonable person could find as the trial court found. See *In re J.H.*, 2020 IL App (4th) 200150, ¶ 68. Accordingly, the court's best-interest determination was not against the manifest weight of the evidence.

¶ 56                                    III. CONCLUSION

¶ 57          For the reasons stated, we affirm the trial court's judgment.

¶ 58          Affirmed.