NOTICE
This Order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

2026 IL App (4th) 250897-U

NOS. 4-25-0897, 4-25-0898, 4-25-0899 cons.

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
January 23, 2026
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| *In re* A.B., E.B., and O.B., Minors | ) | Appeal from the |
| | ) | Circuit Court of |
| (The People of the State of Illinois, | ) | Whiteside County |
| Petitioner-Appellee, | ) | Nos. 19JA51 |
| v. | ) | 19JA52 |
| Michael B., | ) | 19JA53 |
| Respondent-Appellant). | ) | |
| | ) | Honorable |
| | ) | Tionn F. Carter, |
| | ) | Judge Presiding. |

JUSTICE DOHERTY delivered the judgment of the court.
Justices Knecht and Vancil concurred in the judgment.

**ORDER**

¶ 1     *Held*: The trial court's fitness and best-interest determinations were not against the manifest weight of the evidence.

¶ 2     In January 2025, the State filed petitions to terminate the parental rights of respondent Michael B. as to his minor children, A.B. (born in 2019), E.B. (born in 2018), and O.B. (born in 2016). The children's mother is not a party to this appeal. In July 2025, the trial court granted the State's petitions and terminated respondent's parental rights.

¶ 3     Respondent appeals, arguing the trial court's fitness and best-interest determinations were against the manifest weight of the evidence. For the reasons that follow, we affirm.

¶ 4                                    I. BACKGROUND

¶ 5 In August 2019, the State filed petitions to adjudicate the children neglected under section 2-3(1)(b) of the Juvenile Court Act of 1987 (Juvenile Court Act) (705 ILCS 405/2-3(1)(b) (West 2018)), alleging that they were in an environment injurious to their welfare. All three petitions alleged that the children's mother (1) was hospitalized due to psychiatric issues, including self-harming behaviors in the presence of the children; (2) failed to comply with recommendations following her discharge from the hospital; (3) failed to comply with a previously imposed safety plan; and (4) failed to attend counseling appointments and drug screens.

¶ 6 Respondent stipulated that the State could prove the allegations in the petitions. At that time, he was in the custody of the Whiteside County jail on pending criminal charges. The trial court adjudicated the children neglected, made them wards of the court, and placed guardianship and custody of the children with the Illinois Department of Children and Family Services (DCFS). The court subsequently entered a dispositional order finding respondent unfit.

¶ 7 In January 2025, the State filed petitions for termination of parental rights, alleging respondent was unfit under sections 1(D)(a), (b), (m)(i), (m)(ii), and (n) of the Adoption Act (750 ILCS 50/1(D)(a), (b), (m)(i), (m)(ii), (n) (West 2024)) based on (1) abandonment of the children; (2) failure to maintain a reasonable degree of interest, concern, or responsibility as to their welfare; (3) a demonstrated intent to forgo parental rights; (4) failure to make reasonable efforts to correct the conditions that were the basis for the removal of the children during a nine-month period after the adjudication of neglect; and (5) failure to make reasonable progress toward the return of the children to his care during a nine-month period after the adjudication of neglect. The petitions referenced a nine-month period of August 31, 2023, to May 31, 2024.

¶ 8                                    A. Fitness Hearing

¶ 9 On July 29, 2025, the trial court held a fitness hearing. The State requested that the

- 2 -

court take judicial notice of previous orders entered in the case and respondent's criminal convictions. The court took notice with no objection.

¶ 10 Caseworker Felicia Carter testified that the children were brought into care because the mother, who had a history of attempted suicide, ingested brake fluid, believing it to be alcohol. Respondent was incarcerated during the time the children were in protective custody but was subsequently released. Respondent had also been incarcerated during the entire relevant nine-month period. He was convicted of murder in 2023 in Whiteside County case No. 21-CF-137 and had been in custody since June 23 of that year. The conviction was later affirmed on direct appeal. *People v. Bennett*, 2024 IL App (4th) 231103-U. His expected parole date was June 6, 2081. Pursuant to his service plan, respondent was required to cooperate with agencies by signing releases and doing the following: take parenting education classes; complete domestic violence, substance abuse, and mental health assessments; and maintain appropriate housing and employment. Carter believed that respondent had completed the majority of services prior to his incarceration, except for the mental health assessment and maintaining appropriate housing and employment. Carter stated that respondent had not made any progress during the applicable nine-month period. Beyond not having appropriate housing, he also did not supply the children with clothing or provide for their education.

¶ 11 Respondent's sister, Melissa S., testified that she had witnessed respondent with his children, and she described him as "very loving, very playful, [and] very interactive." Respondent had also spent time with Melissa's children, and she would trust him to "watch or babysit" them.

¶ 12 Respondent testified that prior to his incarceration, he had a job, provided clothing and food for the children, and attended all but one scheduled visit with them. He completed and passed every drug test requested. He helped the children with schoolwork, woke them up in the

morning, and cooked them dinner. While incarcerated at the Whiteside County jail, he would have 40 minute phone calls with one of the children, at the child's request. He did not complete the mental health assessment only because he thought he had already done so. He asserted that he had filed a postconviction petition challenging his first degree murder conviction and argued that his parental rights should not be terminated until the petition was disposed of.

¶ 13    The trial court found that the State proved respondent unfit by clear and convincing evidence based on, among other grounds, respondent's failure to make reasonable progress toward the return of the children to his care during a nine-month period after the adjudication of neglect. Specifically, the court opined that there was a consensus among the parties that respondent loved the children. However, the court went on to state as follows:

> "[T]he statute and case law sets forth that at a minimum a parent has to show measurable or demonstrable movement towards the return of the minors. The evidence must show that the parent's progress sufficiently demonstrates such quality that the Court—and it's in bold—in the near future will be able to order the minors returned to parental custody. The Court can only consider the information that's in front of it. I can't consider speculative evidence as to what might happen with the post-conviction relief case and how long it could potentially take or not take."

Given that respondent was incarcerated with no possibility of release in the near future, the court found he was unable to provide suitable housing or otherwise support the children.

¶ 14    B. Best-Interest Hearing

¶ 15    Following a recess, the trial court held the best-interest hearing. Carter testified that the children had been in a foster placement for the majority of their lives. A.B. and O.B. were

placed in traditional foster homes, while E.B. was placed in a therapeutic foster home.

¶ 16        O.B. had been in his placement for almost the entirety of the case and been in foster care for "84 percent of his life." He was living with a family that consisted of a husband and wife as well as six other children (three boys and three girls). The home was large and "busy," and it was a loving environment. O.B. had his own bedroom and enjoyed playing baseball. He had a loving relationship with his foster parents. O.B. previously exhibited behavioral issues but had "progressed tremendously" since his placement. The foster parents met all of O.B.'s needs and wished to adopt him. O.B. was bonded with his foster parents and siblings. In Carter's opinion, staying with the foster parents was the least disruptive placement.

¶ 17        A.B. had been in a foster placement for "95 percent" of his life. He lived with a foster mother and two foster sisters. The home was large, with playground equipment in the backyard, and A.B. had his own room. A.B. appeared happy in his placement, and the foster parent met all of his needs. A.B. was bonded to his foster parent and siblings. The foster parent wished to adopt A.B., and Carter believed the home was the least disruptive placement for him.

¶ 18        E.B. was supervised by another caseworker, but the therapeutic placement was specialized foster care that provided additional services and support. E.B. was diagnosed with attention-deficit/hyperactivity disorder (ADHD) and partial fetal alcohol syndrome. Carter would interact with E.B. during sibling visits once a month, when all of the children would gather for group activities. E.B. appeared to be appropriately dressed and happy during those visits, and all his needs appeared to have been met. E.B. had been in foster care for "78 percent" of his life.

¶ 19        Respondent had not provided food or clothing for the children. Carter believed it was in the best interest of the children that the trial court terminate respondent's parental rights.

¶ 20        On cross-examination by respondent, Carter testified that E.B. had been moved

around in his foster placements 10 times. There was an investigation into physical abuse of E.B. at one of his placements. While E.B. was removed from that foster home, the investigation concluded that the claims were unfounded. E.B. was also placed with respondent's mother at one point, but he was removed due to an investigation of physical abuse that concluded the claims were founded.

¶ 21    Sara Osborne testified that she was the therapeutic foster team lead and handled E.B.'s case. The therapeutic foster care program offered behavioral treatment to foster children who exhibited behavioral issues. She was tasked with overseeing E.B.'s case because he exhibited "difficult behaviors that were not able to be managed in a traditional foster home," including "frequent tantrums," "sexualized behaviors," and "very low distress tolerance." Osborne confirmed the diagnoses of partial fetal alcohol syndrome and ADHD. Additionally, E.B. received weekly therapy and skills coaching, as well as visits with behavioral health services for medication management. Respondent has not been involved in providing or attending any of these services.

¶ 22    E.B. showed significant improvement since being placed in the therapeutic foster home. His tantrums had subsided, and he was able to "accept limits with maturity." His sexualized behaviors had also decreased. Osborne also explained that the therapeutic foster placement was unable to provide permanence, but a potential placement had been identified once E.B. was able to move on from the therapeutic placement. However, E.B. required additional therapy at the time of the hearing. Osborne believed it was in E.B.'s best interest that respondent's parental rights be terminated because of a lack of connection, familiarity, and ability to provide for his needs, which were great. She also felt that termination could help E.B. achieve permanency.

¶ 23    Solange M., O.B.'s foster mother, testified that he was just under three years old when she first cared for him. He was returned to his parents but was placed in her care again shortly

thereafter, when he was still three. She confirmed the specifics of her home and the other children residing therein as testified to by Carter. The children would have sibling visits once a month, but the foster parents would organize additional visits. She and O.B. had a loving and trusting relationship, and she wanted to provide permanency. Solange acknowledged that respondent would write letters to O.B. and that in the past, O.B. would respond. Although there were no restrictions on O.B. writing to respondent, he had not done so "in awhile."

¶ 24 Tracy B., A.B.'s foster mother, testified that he was placed with her when he was three months old. A.B. lived in her home with two other children. A.B. was bonded with Tracy and the other children in the home. Tracy provided for all A.B.'s needs and wanted to adopt him. Respondent did not provide support for A.B.

¶ 25 Respondent's mother, Mary B., testified that she was a Hispanic Catholic and that respondent raised the children as Catholic and would pray with them. E.B. lived with Mary for two years, and during that time, she would take him to family events, where he would see members of the extended family. E.B. was eventually removed from her care.

¶ 26 Respondent's sister Melissa testified that she was Mexican American and Catholic. When E.B. was living with Mary, he would come to family gatherings during the holidays, but he had not been to any since he was removed from Mary's home, and he had not seen any of the extended family during that time.

¶ 27 Respondent testified that the children enjoyed their visits with him and were resistant to leave. Further, the children were angry about being taken away from him. He sent the children letters and pictures while incarcerated. He felt that terminating his parental rights was not in their best interest. He believed that the children would be best served by being raised together with their family traditions, including Hispanic culture, the Catholic religion, and an emphasis on

prayer. In one of his last phone calls with O.B., respondent had asked whether O.B. was still saying his prayers; O.B. responded that he did not know what that meant. The foster parents could not raise the children with the culture or traditions of his family. Further, the termination of his parental rights would lead to the children being isolated from him and their extended family. He also testified that E.B. had previously been "beaten up" for a year and a half in one of the foster placements.

¶ 28 The trial court found the State proved by a preponderance of the evidence it was in the best interest of the children to terminate respondent's parental rights. The court enumerated the statutory best-interest factors, finding that they supported the termination of respondent's parental rights. The court noted that the children were bonded with their foster parents, developed community ties, and were thriving in their respective placements. While respondent was the "non-offending" parent at the outset of the cases, the evidence established that he was not in a position to provide for the best interest of the children. The court further opined that

> "[w]hile it may be ideal that the children be placed in the same home, the next best thing is occurring, the children are placed with foster care family members that are allowing these children to have a relationship with each other both through scheduled DCFS sibling visits and outside of those scheduled sibling visits even with the child that's—their sibling that's not at issue before the Court today."

The court believed the evidence demonstrated that although respondent loved and cared for the children, he would be unable to provide for them now or in the near future.

¶ 29 The trial court terminated respondent's parental rights and set the permanency goal for the children to adoption.

¶ 30 This appeal followed.

¶ 31                                    II. ANALYSIS

¶ 32         On appeal, respondent argues that the trial court erred in finding that the State proved him unfit by clear and convincing evidence and that it was in the best interest of the children to terminate his parental rights.

¶ 33                              A. Fitness Determination

¶ 34         Under section 2-29(2) of the Juvenile Court Act (705 ILCS 405/2-29(2) (West 2024)), the involuntary termination of parental rights is a two-step process. First, the State must prove by clear and convincing evidence the parent is "unfit," as defined in the Adoption Act. *In re Donald A.G.*, 221 Ill. 2d 234, 244 (2006). If the State proves unfitness, it then must prove by a preponderance of the evidence that termination of parental rights is in the best interest of the children. *In re D.T.*, 212 Ill. 2d 347, 363-66 (2004).

¶ 35         A determination of parental unfitness involves factual findings and credibility determinations that the trial court is in the best position to make because its "opportunity to view and evaluate the parties *** is superior." (Internal quotation marks omitted.) *In re M.I.*, 2016 IL 120232, ¶ 21. A trial court's finding of parental unfitness will not be reversed unless it is against the manifest weight of the evidence. *In re N.G.*, 2018 IL 121939, ¶ 29. A decision is against the manifest weight of the evidence only when the opposite conclusion is clearly apparent. *Id.* "As the grounds for unfitness are independent, the trial court's judgment may be affirmed if the evidence supports the finding of unfitness on any one of the alleged statutory grounds." *In re H.D.*, 343 Ill. App. 3d 483, 493 (2003).

¶ 36         Among the grounds of unfitness, the trial court found respondent failed to make reasonable progress toward the return of the children during the relevant nine-month period. See 750 ILCS 50/1(D)(m)(ii) (West 2024). Illinois courts have defined "reasonable progress" as

"demonstrable movement toward the goal of reunification." (Internal quotation marks omitted.) *In re Reiny S.*, 374 Ill. App. 3d 1036, 1046 (2007). Reasonable progress is an objective standard (*In re A.R.*, 2023 IL App (1st) 220700, ¶ 70), and courts have stated that

> "[r]easonable progress exists when the trial court can conclude that progress being made by a parent to comply with directives given for the return of the minor is sufficiently demonstrable and of such a quality that the trial court will be able to order the minor returned to parental custody in the near future." *In re D.T.*, 2017 IL App (3d) 170120, ¶ 17.

¶ 37 Here, the trial court's finding that respondent failed to make reasonable progress toward reunification is supported by the weight of the evidence. The State did not seek to establish respondent's first degree murder conviction or repeated incarceration as a basis for termination. See 750 ILCS 50/1(D)(i), (s) (West 2024). However, that does not mean that the effects of respondent's incarceration are not part of the picture here. It is well established that "[t]ime in prison is included in the nine-month period during which reasonable progress must be made." *In re F.P.*, 2014 IL App (4th) 140360, ¶ 89 (citing *In re J.L.*, 236 Ill. 2d 329, 343 (2010)). In other words, incarceration does not toll the requirement of reasonable progress toward the goals of the service plan. To that end, despite respondent's claim that he made reasonable progress "in light of his circumstances," the fact that personal circumstances, such as incarceration, inhibit reasonable progress is irrelevant to the "objective standard." (Internal quotation marks omitted.) *Id.*

¶ 38 While it is true that respondent had completed other services under the service plan, those were completed prior to the nine-month period at issue. See *J.L.*, 236 Ill. 2d at 341 (noting whether a parent has made reasonable progress toward the return of a child depends on progress that occurred *during* the relevant nine-month period); *In re D.F.*, 208 Ill. 2d 223, 242-43 (2003)

(noting that a court is not permitted to consider any evidence outside the relevant nine-month period). Respondent claims that he made demonstrable movement towards the goal of reunification but fails to point to what actions he undertook during the period, aside from attending visitation when allowed. Respondent failed to show progress in obtaining suitable housing, maintaining employment, and completing a mental health assessment. From an objective view, respondent failed to make reasonable progress during the nine-month period because the children could not be returned to him in the near future.

¶ 39 Respondent further contends that reasonable progress is not measured based on progress under a service plan alone and that, given his circumstances, he made progress. As noted above, the standard is not subjective. Moreover, as the State points out, respondent's inability to be physically present in the children's lives has been an issue throughout the pendency of these cases, as respondent was in custody on pending charges shortly after the children came into care (November 7, 2019, through March 9, 2020). Reviewing courts have found that

> "[t]he benchmark for measuring a parent's reasonable progress under section 1(D)(m) of the Adoption Act encompasses the parent's compliance with the service plans and court's directives in light of the condition that gave rise to the removal of the child and other conditions which later become known that would prevent the court from returning custody of the child to the parent." *D.T.*, 2017 IL App (3d) 170120, ¶ 17.

While the trial court categorized respondent as the "non-offending" parent, his inability to remain outside of jail and prison is a subsequent circumstance that has prevented him from doing the things necessary to return the children to his custody.

¶ 40    In this vein, respondent also argues that the trial court erred in considering matters pertaining to the best interest of the children when making its determination on fitness. Specifically, respondent points to the court's ruling from the bench:

> "We're here today and I can only take the evidence that's been presented today and that evidence shows that these children—all three of them have been in care—foster care of some shape or form, whether it be with family, traditional foster care, someone outside of the custody of their parents for over 70 percent of their lives.
>
> ***
>
> The Court doesn't find with Mother having abandoned the children and Father being incarcerated with no date in the future, whereas the children would still be minors, being concrete for his release that the Court could order in the near future that the minors would be able to be returned home to Father. Whether or not he could provide a good home when they are released or provide for their needs is all speculative. Although he may have done it at some point, that was six years ago and he may have done it well. I don't have any information on housing or any ways that he could provide for his children if he was to be released."

¶ 41    Initially, respondent argues that the trial court erred when considering the potential future of the children and whether he could provide adequate housing. We disagree. Even if this unpreserved claim is viewed through the lens of plain error, reasonable progress exists when a respondent is complying with directives to such an extent that return of the minor is feasible in "the near future." *Id.* The excerpt above relating to temporal considerations clearly relates to this principle.

¶ 42    Additionally, respondent argues that the trial court's mention of the amount of time

the children had spent in care proves that the court was considering an issue inherent to a best-interest determination and not respondent's fitness. Again, we disagree. In context, this comment appears to be in relation to respondent's request that the court delay its ruling until his postconviction petition received a first-stage ruling. Immediately preceding the quoted text in respondent's brief, the court stated, "I can't consider speculative evidence as to what might happen with the post-conviction relief case and how long it could potentially take or not take." Furthermore, when making a determination that respondent had failed to make reasonable progress, the court clearly articulated the proper standard and noted principles from caselaw in making its determination.

¶ 43        Accordingly, the trial court's determination respondent failed to make reasonable progress toward the return of the children was not against the manifest weight of the evidence, and the court did not consider improper evidence.

¶ 44                              B. Best-Interest Determination

¶ 45        Respondent next contends the trial court's best-interest determination was against the manifest weight of the evidence.

¶ 46        When a trial court finds a parent unfit, "the court then determines whether it is in the best interests of the minor that parental rights be terminated." *D.T.*, 212 Ill. 2d at 352. "[A]t a best-interests hearing, the parent's interest in maintaining the parent-child relationship must yield to the child's interest in a stable, loving home life." *Id.* at 364. The State must prove by a preponderance of the evidence termination of parental rights is in the minor's best interest. *Id.* at 366. In making the best-interest determination, the court must consider the factors set forth in section 1-3(4.05) of the Juvenile Court Act (705 ILCS 405/1-3(4.05) (West 2024)). These factors include:

"(1) the child's physical safety and welfare; (2) the development of the child's identity; (3) the child's background and ties, including familial, cultural, and religious; (4) the child's sense of attachments, including love, security, familiarity, and continuity of affection, and the least-disruptive placement alternative; (5) the child's wishes; (6) the child's community ties; (7) the child's need for permanence, including the need for stability and continuity of relationships with parental figures and siblings; (8) the uniqueness of every family and child; (9) the risks related to substitute care; and (10) the preferences of the persons available to care for the child." *In re Jay. H.*, 395 Ill. App. 3d 1063, 1071 (2009) (citing 705 ILCS 405/1-3(4.05) (West 2008)).

"The court's best interest determination [need not] contain an explicit reference to each of these factors, and a reviewing court need not rely on any basis used by the trial court below in affirming its decision." *In re Tajannah O.*, 2014 IL App (1st) 133119, ¶ 19. On review, "[w]e will not disturb a court's finding that termination is in the [child's] best interest unless it was against the manifest weight of the evidence." *In re T.A.*, 359 Ill. App. 3d 953, 961 (2005).

¶ 47            In relation to A.B. and O.B., the evidence demonstrated that the children had strong bonds with their foster parents and foster siblings. The foster parents provided for the children's needs, including their safety and security. The trial court also found that the children's sense of community and identity resided in their foster placements. The children's sense of attachments, including love, security, familiarity, and continuity of affection, all favored termination, along with the fact that the current placement alternative was the least disruptive. The testimony established that the children were not isolated and frequently enjoyed visits with each other and their biological half-sister. The foster parents were also willing to provide permanence for the children.

¶ 48        E.B. was making progress in a therapeutic placement, and his foster parent provided for all his needs. E.B. required further therapy before he could be transitioned to a traditional foster home. Although the placement was unable to provide permanence, a potential adoptive home had been identified. Reviewing courts have consistently found that the lack of an adoptive placement does not preclude a finding that termination of parental rights is in the child's best interest. See *In re Shru. R.*, 2014 IL App (4th) 140275, ¶ 25 (collecting cases).

¶ 49        Respondent argues that the factors concerning the children's identity and their familial, cultural, and religious background and ties favored preserving his parental rights. Specifically, he contends that "[t]he children were born into a strong and proud Hispanic and Catholic tradition," and he asserts that "this portion of their identity has been significantly damaged" while in foster care. This argument is problematic, however, because while respondent clearly testified and elicited responses from his mother and sister that established his culture and faith, he failed to elicit any testimony from the foster parents regarding *their* ethnicity, cultural practices, or religious beliefs and practices. Further, some of the assertions in respondent's briefing, such as the children having been baptized, are absent from the record. To that extent, respondent's argument regarding the children's cultural and religious identity is unsupported by the record. See *Chicago Province of Society of Jesus v. Clark & Dickens, L.L.C.*, 383 Ill. App. 3d 435, 443 (2008) ("The law is well settled that appellants bear the duty to present a record *** which fairly and fully presents all matters necessary and material for a decision of the question raised." (Internal quotation marks omitted.)); *Webster v. Hartman*, 309 Ill. App. 3d 459, 460 (1999) ("[A]rguments made by an appellant that depend on facts that are not contained in the record are not sustainable on appeal." (Internal quotation marks omitted.)). The lack of a record on this point is to the detriment of respondent on appeal, regardless of where the burden may lie in the trial

court. *Webster*, 309 Ill. App. 3d at 461.

¶ 50    Moreover, the evidence in the case established that the children had spent a significant portion, if not a majority of their lives in foster care, severely undercutting the notion that the foster parents were somehow diminishing a prior sense of identity, traditions, or heritage.

¶ 51    Even considering this argument as presented, resolving the factors requested by respondent in his favor is not dispositive where the weight of the remaining evidence supports termination. See *In re S.H.*, 2014 IL App (3d) 140500, ¶ 34 (noting that no single factor is dispositive). Given the remaining evidence that respondent was unable to provide for the children's needs, we cannot conclude the evidence in the record "clearly calls for the opposite finding" or is such that "no reasonable person" could find as the trial court found. (Internal quotation marks omitted.) *In re J.H.*, 2020 IL App (4th) 200150, ¶ 68. Respondent's contention of error essentially asks this court to place more weight on the certain factors and then reweigh the remaining evidence, which is not our function. See *In re Marriage of Smith*, 172 Ill. 2d 312, 324-25 (1996).

¶ 52    It appears undisputed from the record that respondent cared for and loved his children. However, at the best-interest hearing, "the parent's interest in maintaining the parent-child relationship must yield to the child's interest in a stable, loving home life." *D.T.*, 212 Ill. 2d at 364. Once the trial court found respondent unfit, all considerations yielded to the best interest of the children and their interest in a stable, loving, and safe home environment. *Id.*

¶ 53    Accordingly, the trial court's best-interest determination was not against the manifest weight of the evidence.

¶ 54                                    III. CONCLUSION

¶ 55    For the reasons stated, we affirm the trial court's judgment.

¶ 56    Affirmed.